SECRET//NOFORN

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KEVIN POULSEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 17-cv-3531 |
| ) | |
| U.S. DEPARTMENT OF DEFENSE *et al.,* ) | |
| ) | |
| Defendants. ) | |
| ) | |

## THIRD DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     (U) I am currently the Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division ("IMD"), in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     (U) In my official capacity as Section Chief of RIDS, I supervise approximately 242 employees who staff a total of twelve FBI Headquarters ("FBIHQ") units and three field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the

Classified By: J36J24T72
Derived From: Multiple Sources
Declassify On: 20431231

SECRET//NOFORN

SECRET//NOFORN

FOIA, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009 and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13526, 75 Fed. Reg. 707 (2010), and the preparation of declarations in support of Exemption (b)(1) claims under the FOIA. I have been designated by the Attorney General of the United States as an original classification authority, and a declassification authority pursuant to Executive Order 13526 §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     (U) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of plaintiff's FOIA request for six categories of records "concerning the United States' alleged electronic surveillance of Donald J. Trump during [the] 2016 election campaign."

(4)     (U) This declaration is being submitted in support of DOJ's renewed motion for summary judgment in this case. It incorporates my first declaration dated November 17, 2017, see ECF No. 31-1, Declaration of David M. Hardy (hereafter "First Hardy Declaration"), and my second declaration dated March 16, 2018, see ECF No. 45-1, Second Declaration of David M. Hardy (hereafter "Second Hardy Declaration"). The Administrative History of plaintiff's request is set forth fully in the First Hardy Declaration at paragraphs 5-13. Only those portions

SECRET//NOFORN

2

SECRET//NOFORN

necessary for context here have been repeated in this declaration.

(5)     (U)  As discussed in detail below, the FBI is defending its Glomar response to plaintiff's FOIA request, except to the limited extent that the Glomar response has been pierced with respect to the FBI's "no records" response regarding President Trump's March 4, 2017 tweets about President Obama alleging wiretapping Trump Tower and to the FBI's response with respect to certain records about surveillance of Carter Page under the Foreign Intelligence Surveillance Act.

## (U)  PART I:
## RESPONSE TO EXTENT REQUEST SEEKS SURVEILLANCE RECORDS RELATED TO THE PRESIDENT'S MARCH 4, 2017 TWEETS

(6)     (U)  As plaintiff referenced in his request, President Trump made a four-part post on Twitter on March 4, 2017, alleging that President Obama had his "'wires tapped' in Trump Tower just before the victory."

(7)     (U)  During sworn testimony before the House Permanent Selection Committee on Intelligence ("HPSCI") on March 20, 2017, then FBI Director James B. Comey was asked about this by Congressman Schiff and responded:

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components. The Department has no information that supports those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017. *See* https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9f19a0cf9cf (last accessed 6/12/2017).

SECRET//NOFORN

SECRET//NOFORN

(8)     (U) Although the FBI initially provided an unlimited Glomar response to plaintiff's request, former FBI Director Comey explained on behalf of both the FBI and DOJ that neither agency had any information supporting the March 4 tweets – *i.e.*, no records or information of the alleged wiretapping – during his March 20, 2017 testimony before HPSCI. Out of an abundance of caution, FBI personnel confirmed this by consulting with personnel knowledgeable about Director Comey's statements and the surveillance activities of the FBI, and confirmed that no such records exist. Accordingly, to the extent that the plaintiff is seeking records about the FBI conducting electronic surveillance on then-candidate Trump at Trump Tower, the FBI has no responsive records.

## (U)  PART II:
## HANDLING OF ACKNOWLEDGED CARTER PAGE FISA RECORDS

### (U) THE FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978

(9)     (U) The Foreign Intelligence Surveillance Act of 1978, or "FISA," establishes procedures for the physical search, electronic surveillance, and collection of "foreign intelligence information" of "foreign powers" and "agents of foreign powers." 50 U.S.C. §§ 1801(b)-1885c. The statute also created the Foreign Intelligence Surveillance Court, or FISC, to oversee requests for surveillance warrants by federal law enforcement and intelligence agencies.

(10)     (U) The FISC meets in secret, and approves or denies requests for orders permitting surveillance under the FISA. Proceedings before the FISC are generally ex parte and non-adversarial. But see 50 U.S.C. § 1803(i)(2)(A). The court hears evidence presented by DOJ, and unlike most opinions rendered by other Federal courts, there is no provision for the

SECRET//NOFORN

SECRET//NOFORN

routine publication or release of FISC opinions or other information regarding FISC hearings.[1]

(11)    (U) FISA is, itself, an intelligence method and details of its use are classified, and prohibited from disclosure under the National Security Act of 1947, 50 U.S.C. § 3024(i)(1). Specifically, the identity of a target of a FISA application/warrant is a classified fact, as are the dates of FISA-authorized surveillance, the types and locations of authorized surveillance methods and tools, and other details about the authorized surveillance. Accordingly, FISA applications previously have never been disclosed publicly, including under the FOIA or through IC transparency efforts.

## (U) TIMELINE OF EVENTS

(12)    (U) In July 2016, the FBI opened an investigation of "the Russian government's efforts to interfere in the 2016 Presidential election[.]"[2] As part of this investigation, in October 2016, the FBI first sought and obtained authority to conduct surveillance on Carter Page under the Foreign Intelligence Surveillance Act ("FISA"). The existence of the Carter Page FISAs, like any other, was a classified fact. The Government thereafter sought and obtained three renewals from the Foreign Intelligence Surveillance Court ("FISC") to continue surveilling Page. The existence of the three renewals and resulting orders was also a classified fact.

(13)    (U) Separately, in March 2017, the House Permanent Select Committee on

---

[1] (U) Under some circumstances, certain FISC opinions and orders have been released in response to FOIA requests or as part of Intelligence Community ("IC") transparency efforts. See 50 U.S.C. § 1872.

[2] (U) On March 20, 2017, then-FBI Director James B. Comey publicly confirmed the existence of this investigation in testimony before Congress, stating "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts." Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation).

SECRET//NOFORN

SECRET//NOFORN

Intelligence ("HPSCI") announced an investigation into "the Russian active measures campaign targeting the 2016 U.S. election." *See* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767. Although not originally part of the scope of that investigation, HPSCI added additional areas of inquiry, including the purported abuse of FISA. *See* https://intelligence.house.gov/uploadedfiles/hpsci_russia_investigation_one_page_summary.pdf. As part of its investigation, HPSCI sought and was ultimately provided access to the Carter Page FISA applications and orders.

(14)    (U) Plaintiff submitted his FOIA request to the FBI on March 5, 2017, seeking:

1. Legal analyses, memorandum, court orders, meeting notes, calendar entries, presentation slides, petitions, applications, motions and appeal briefs held by FBI concerning, planning, or seeking authorization for electronic surveillance, by a U.S. government agency or contractor, of the oral, electronic or digital communications of Donald J. Trump or any of his advisors between June 16, 2015 and November 8, 2016
2. Reports, e-mail, affidavits and documents held by FBI concerning or derived from such surveillance or anticipated surveillance.
3. Recordings produced from such surveillance, including audio or video recordings and data files
4. Metadata captured from such surveillance, including but not limited to email headers and timestamps
5. Transcripts of such intercepted communications
6. Entries pertaining to such surveillance found in FBI databases, including but not limited to the FBI's ELSUR Data Management System and the FBI's Case Management System

*See* ECF No. 31-1, First Hardy Declaration, at ¶¶ 5-7 and Exhibit A. The FBI initially responded to plaintiff's FOIA request by issuing a so-called Glomar response on April 4, 2017, explaining that confirming or denying the existence of responsive records would cause harms protected against by FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E). *See id.* at ¶ 10 and Exhibit D.

SECRET//NOFORN

SECRET//NOFORN

(15)    (U)  On May 17, 2017, the Acting Attorney General appointed Robert S. Mueller as Special Counsel. *See* DOJ Order No. 2915-2017 (May 17, 2017). Under the terms of his appointment, Special Counsel Mueller is authorized to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." The FBI's FISA-authorized surveillance on Page continued after the Special Counsel was appointed.

(16)    (U)  Plaintiff filed this FOIA lawsuit on June 19, 2017, *see* ECF No. 1, Complaint, and defendants moved for summary judgment on November 17, 2017. ECF No. 31, Motion for Summary Judgment. For its part, the FBI defended its Glomar response in the summary judgment motion, although it noted a limited piercing of that response. Specifically, the FBI explained that neither the FBI nor DOJ had any information supporting the President's March 4, 2017 tweets alleging that President Obama had his "'wires tapped' in Trump Tower just before the victory." *See* ECF No. 31-1, First Hardy Declaration, at ¶¶ 14-17. Thus, as to that particular topic, the FBI issued a "no records" response rather than a Glomar response. *Id.* at ¶ 17.

(17)    (U)  In February 2018, the HPSCI Majority and Minority issued two memoranda regarding HPSCI's Russia investigation, which are often colloquially referred to by the names of the HPSCI Chairman and Ranking Member – *i.e.*, as the "Nunes Memo" and the "Schiff Memo." As originally drafted, both memoranda were classified because they revealed FISA-authorized

SECRET//NOFORN

SECRET//NOFORN

surveillance on an identified target – Carter Page.[3]

(18)   (U) HPSCI voted to release the Nunes Memo publicly but could not immediately do so because it was classified at the Top Secret level. Thus, pursuant to clause 11(g) of Rule X of the House of Representatives, HPSCI forwarded the Nunes Memo to President Trump with a request to declassify it. The declassification request did not ask the President to opine on the judgment and conclusions of the HPSCI Majority.

(19)   (U) On February 2, 2018, President Trump declassified the Nunes Memo "in light of the significant public interest in the memorandum." *See* Letter from Donald F. McGahn II, Counsel to the President, to Devin Nunes, Chairman of HPSCI (Feb. 2, 2018). HPSCI thereafter publicly released the Nunes Memo with a cover letter authored by Mr. McGahn documenting the President's action (which was also noted on the Nunes Memo itself with a stamp stating "Declassification by order of the President February 2, 2018"). Mr. McGahn's cover letter made it "clear [that] the Memorandum reflects the judgments of its congressional authors." *See* https://docs.house.gov/meetings/IG/IG00/20180129/106822/HMTG-115-IG00-20180129-SD001.pdf.

(20)   (U) Subsequently, the HPSCI Minority submitted the Schiff Memo to DOJ, asking for a classification review. The FBI conducted the review requested by the HPSCI Minority and identified those portions of the Schiff Memo that contained classified information

---

[3] (U) Under classification rules, an entire document is classified if any single piece of information in it is classified. So, for example, an entire document is classified as Top Secret if it contains any Top Secret information, even if it also contains Secret, Confidential, or unclassified information. Moreover, information that by itself is unclassified can become classified when combined or associated with other unclassified or classified information, if the compiled information reveals an association or relationship that meets the standards and criteria for classification (*i.e.*, when disclosure of the compiled information would, itself, reveal classified information).

SECRET//NOFORN

SECRET//NOFORN

unaffected by the President's declassification of the Nunes Memo.[4]

(21)    (U)  The FBI did not declassify any additional information during the review of the Schiff Memo, nor did the HPSCI Minority request any further declassification.  Rather, the FBI conducted a review to identify what information remained classified in light of the President's declassification of the Nunes Memo.  The HPSCI Minority redacted those portions of the Schiff Memo that the FBI identified as classified and then released the redacted memorandum.  *See* https://docs.house.gov/meetings/ig/ig00/20180205/106838/hmtg-115-ig00-20180205-sd002.pdf.

(22)    (U)  The HPSCI Minority did not ask the FBI to opine on their judgment or conclusions, and the FBI did not do so.  As with the Nunes Memo, the Schiff Memo reflects the judgments of its congressional authors.[5]

(23)    (U)  Although DOJ and the FBI had previously and properly refused to confirm or deny the existence of records responsive to plaintiff's request – except as to the limited topic related to the President's March 4 tweets – on the grounds that doing so could reasonably be expected to reveal classified information, among other things, the President's declassification of the existence of the Carter Page FISA applications and orders, through his declassification of the

---

[4] (U) The President's declassification of the Nunes Memo resulted only in the declassification of the classified information contained in that memorandum.  It did not broadly declassify all information contained in or related to the Carter Page FISA applications and orders.

[5] (U) On January 4, 2018, Senators Grassley and Graham referred to DOJ their allegations that Christopher Steele had violated 18 U.S.C. § 1001.  The referral memorandum referenced the Page FISA applications/orders and identified Steele, a classified intelligence source.  Thus, the memorandum was classified. After the declassification of the Nunes Memo and the release of the Nunes and Schiff Memos, the FBI was asked to conduct a classification review of the referral memorandum so that the Senate could publicly release it.  The FBI conducted the classification review and identified the portions that remained classified following the declassification of the Nunes Memo.  The memorandum reflects the Senators' judgments and conclusions; they did not ask the FBI to opine on them and the FBI did not do so as part of its classification review.

SECRET//NOFORN

SECRET//NOFORN

Nunes Memo, pierced that Glomar response as to the FISA applications and resulting orders referenced in the Nunes Memo to the extent such applications were responsive to pending FOIA requests.[6]

(24)    (U)  Consequently, DOJ and the FBI undertook a FOIA review of the four sets of Carter Page FISA applications and orders revealed through the President's declassification order in order to determine whether any information necessarily had to be disclosed as a result of that order.  This review was undertaken in order to respond to a multitude of FOIA requests.

(25)    (U)  In the end, the FBI processed 598 pages, which is the totality of the four Page FISAs, for release under the FOIA; publicly released five pages in full and 407 pages in part, with information redacted pursuant to FOIA exemptions; and withheld 186 pages in full pursuant to FOIA exemptions.  The FBI relied on the following FOIA exemptions in redacting information or withholding pages:  Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  On July 20, 2018, the FBI publicly produced all reasonably segregable, non-exempt portions of these records in its electronic reading room, The Vault, at https://vault.fbi.gov/d1-release/. *See also* Exhibit A, Response Letter.  Considering that FISA applications previously have never been disclosed publicly, the disclosure of the Page FISA applications was unprecedented.

## (U)  SCOPE OF PLAINTIFF'S REQUEST

(26)    (U)  As relevant to this case, only the first FISA package falls within the scope of plaintiff's request.  Specifically, plaintiff's request sought records about electronic surveillance "of Donald J. Trump or any of his advisors between June 16, 2015 and November 8, 2016." *See*

---

[6] (U) The Nunes Memo referenced an initial FISA application and order from October 2016, and three renewals thereafter.

SECRET//NOFORN

SECRET//NOFORN

ECF No. 31-1, First Hardy Declaration, at ¶ 5 and Exhibit A. The first application was submitted and approved in October 2016; the next application seeking renewal was not submitted until January 2017. So the three renewal applications are outside the scope of plaintiff's request.

(27)   (U) Accordingly, this case involves 83 publicly released pages, two of which were released in full and 81 of which were released in part, with redactions pursuant to Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(28)   (S//NF) Also, as noted above, 186 pages of records were withheld in full as part of the processing of all four of the Page FISAs; the FBI cannot publicly disclose how many, if any, of those pages were associated with the first application and thus withheld in response to plaintiff's request, for the reasons explained in this declaration. █████████████

(29)   (U) Plaintiff's request is not limited to just the initial Page FISA application and order, however. As explained previously, he submitted a broad six-item request seeking information about electronic surveillance on then-Candidate Trump or his associates. With

SECRET//NOFORN

respect to anything other than the FISA-authorized surveillance of Page, the FBI is maintaining its Glomar response. With respect to the FISA-authorized surveillance of Page, the FBI's responses are summarized as follows.

(A)   (U) Item 1 of plaintiff's request encompasses the initial Page FISA application and order but would also cover other documents "concerning, planning, or seeking authorization for" FISA surveillance on Page "between June 16, 2015 and November 8, 2016." Item 2 seeks "[r]eports, e-mail, affidavits and documents" concerning or derived from the actual or anticipated surveillance of Page authorized by the FISC between June 16, 2015 and November 8, 2016. Item 6 seeks entries in FBI databases pertaining to the FISA-authorized surveillance of Page between June 16, 2015 and November 8, 2016. The FBI has identified records responsive to these portions of the request that it can acknowledge without such acknowledgement itself causing harms protected against by FOIA exemptions. However, the FBI has concluded that these additional records are categorically exempt under Exemption (b)(7)(A), as well as other exemptions, and therefore is withholding them.[7]

(B)   (U) The FBI is maintaining its Glomar response for Items 3 – 5 of plaintiff's request as they pertain to the FISA-authorized surveillance of Page, pursuant to Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E). Specifically, these items seek particular types of records that might result from surveillance, such as recordings and/or transcripts from intercepted communications or metadata from captured e-mail. However, there has been no official public disclosure of the specific types of surveillance authorized by the FISC in response to the initial FISA application on Page – *i.e.*, whether or not the FBI was authorized to intercept

---

[7] (U) The FBI has been authorized to brief only the Exemption (b)(7)(A) withholdings at this time, while preserving its ability to assert and defend any withholdings under other exemptions if it does not prevail under Exemption (b)(7)(A).

SECRET//NOFORN

SECRET//NOFORN

verbal or written communications. And even assuming specific techniques were authorized, there has been no official public disclosure about whether or not the techniques were successful – *i.e.*, whether or not the FBI was able to gather the specific types of records that plaintiff references even if it was authorized to do so. The justification for the FBI's Glomar response in this regard is discussed further below in conjunction with the FBI's explanation of its Glomar response generally.

(U) SEARCHES

(U) *Initial Page FISA Package*

(30)    (U) In most instances when searching for records to respond to a FOIA request, RIDS's first step is to conduct a search of the FBI's Central Records System ("CRS"). Such a search was not necessary here. In this case, a known universe of potentially responsive records was revealed through the release of the Nunes and Schiff Memos. Specifically, the memoranda revealed the existence of four FISA applications submitted for surveillance on Carter Page, starting in October 2016 and continuing through three renewals, with accompanying FISA orders. FBI FOIA personnel consulted with FBI personnel familiar with the Russia investigation to locate the applications and resulting orders regarding the four acknowledged Page FISAs. Through these efforts, the FBI was able to locate each of the four applications and resulting orders. At the same time, the FBI also contacted DOJ's National Security Division ("NSD"), which represents the Government before the FISC, to obtain copies of all four applications that NSD had submitted to the FISC and all accompanying orders on the applications. NSD provided the FBI copies of all four packages for processing. The FBI then confirmed that between its records and the NSD records, it had complete copies of each of the four FISA packages on Carter Page that had been revealed by the Nunes and Schiff Memos,

SECRET//NOFORN

SECRET//NOFORN

including the initial FISA package, which are the records specifically within the scope of plaintiff's FOIA request.

### (U) *Additional Searches for Items 1, 2, and 6 of Plaintiff's Request*

(31)    (U) A search of the FBI's Central Records System using Sentinel was conducted in responding to Items 1, 2, and 6.  The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions.  The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(32)    (U) The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters.  For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components:  (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[8]  Within each case file, pertinent

---

[8] (U) For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789" is the assigned case specific file number.

SECRET//NOFORN

SECRET//NOFORN

documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.

(33)    (U) The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. The CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval. The entries in the general indices fall into two category types:

    a.   (U) <u>Main entry</u>. This entry pertains to records indexed to the main subject(s) of a file, known as "main file" records. The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.

    b.   (U) <u>Reference entry</u>. This entry, or a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter.

(34)    (U) FBI Special Agents ("SA") and/or designated support personnel may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery). Indexing information in the CRS is based on operational necessity, and the FBI only indexes that information considered relevant and necessary for future retrieval. Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

(35)    (U) Records in the CRS are accessed through Sentinel, the FBI's next generation case management system, which became effective FBI-wide on July 1, 2012. Sentinel provides

SECRET//NOFORN

SECRET//NOFORN

a web-based interface for FBI users to access CRS records. When a record is generated in or saved into Sentinel, information in the record is indexed for future retrieval.

(36)    (U) Here, the CRS was searched via Sentinel for any records in the applicable pending Russian interference investigation files containing the terms "surveillance" or "FISA" for the period June 16, 2015 to November 8, 2016. Additional electronic searches of electronic locations specifically associated with the investigation were conducted using the same search terms and timeframe. Finally, additional electronic searches were also conducted of the custodians (*i.e.*, FBI Special Agents and Support Employees including attorneys and Intelligence Analysts) who worked on the initial Page FISA for the period June 16, 2015 to November 8, 2016, using the search terms "Carter Page" and the code name of the pertinent investigation.[9] The FBI concluded that no other record keeping systems were likely to maintain the records sought by plaintiff in Items 1, 2, and 6.[10]

(37)    (U) Responsive records were located as a result of the above-described searches. The FBI has concluded that all such records are exempt from disclosure and that even describing the specific nature or volume of them would cause harms protected against by FOIA exemptions.

---

[9] (U) The searches conducted in locations specific to the pending investigation (including the investigative files) did not use the terms "Carter Page" or the code name because such a search would have been unreasonably overbroad and would have returned results unrelated to the FISA-authorized surveillance of Page. (The code name is itself sensitive and thus cannot be publicly disclosed.)

(U) Conversely, the electronic searches, which included e-mails, were not limited to locations specific to the pending investigation. Thus, searching those locations for the terms "FISA" or "surveillance" would have been unreasonably overbroad and likely would have returned results about unrelated to Carter Page.

[10] (U) Plaintiff specifically identified two systems he thought should be searched for Item 6: "the FBI's ELSUR Data Management System" and "the FBI's Case Management System." As to the latter, the FBI does not maintain a record keeping system with this name, and assumes that plaintiff is referring to the CRS or Sentinel. As to the former, this system no longer exists and did not exist during the period covered by plaintiff's request.

SECRET//NOFORN

SECRET//NOFORN

### (U) FOIA EXEMPTIONS – INITIAL PAGE FISA PACKAGE

(38)    (U) Substantial portions of the Page FISA applications and resulting orders remain classified; the President's declassification of the Nunes Memo resulted in the declassification of a relatively limited amount of information.  Thus, the information that remains classified was protected pursuant to Exemption (b)(1).  Furthermore, as previously noted, the materials contain investigative information relevant to the pending investigation into Russia's interference in the 2016 Presidential election.  Disclosure of this withheld relevant information (none of which exactly matches that disclosed in the Nunes, Schiff, or Grassley/Graham Memos) could reasonably be expected to interfere with this active and pending investigation.[11]  *See* 5 U.S.C. § 552(b)(7)(A).  The FISA materials also contain information from and about intelligence sources, and detailed information about intelligence methods, including non-public information about FISA surveillance.  This information is also protected.  *See* 5 U.S.C. §§ 552(b)(3), (b)(7)(D), (b)(7)(E).  Finally, these documents contain personally identifying information about DOJ and FBI personnel and other third parties, which was withheld pursuant to the FOIA.  *See* 5 U.S.C. §§ 552(b)(6), (b)(7)(C).

(39)    (U) The FBI carefully reviewed, processed, and publicly released all non-exempt portions of the four Page FISA applications and resulting orders that were revealed in the Nunes Memo, including the records comprising the initial FISA package, which are the records

---

[11] (U) While the three congressional memoranda each reflect statements by the Legislative Branch, not the Executive Branch, in light of the President's actions with respect to the congressional memoranda, the FBI identified and released any information contained in the Page FISA materials that matched information released in the congressional memoranda.

SECRET//NOFORN

SECRET//NOFORN

specifically within the scope of plaintiff's FOIA request.[12]  In conjunction with DOJ, the FBI conducted a thorough review of each page and redacted information or withheld pages in full pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(40)    (U)  Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of non-exempt material.  No reasonably segregable, non-exempt portions have been withheld.  To further describe the information withheld could reveal the very material which the FBI seeks to protect.

(41)    (U)  Each redaction in the publicly released pages of the initial Page FISA package is marked by two pieces of information:  a FOIA exemption (*e.g.*, "(b)(6)") and a code (*e.g.*, "-1"). The FOIA exemption marking shows that the redaction contains information determined to be exempt under that particular exemption.  The code corresponds to a particular category of information determined to be exempt.  For example, where "(b)(6)-1" appears on a document, it signals that the FBI relied on FOIA Exemption (b)(6), which protects against unwarranted invasions of personal privacy, to protect a particular category of information – *i.e.*, the names and/or other identifying information of FBI Special Agents or Support Personnel.[13]

---

[12] (U) The released pages are Bates numbered "17-cv-597 (FBI)-1" through "17-cv-597 (FBI)-412." The pages specifically responsive to plaintiff's request are 17-cv-597 (FBI)-1 – 83. A chart listing each Bates page and the coded category or categories applied on the page is appended to this declaration as Exhibit B.

[13] (U) In response to plaintiff's request, NSD located the proposed application version of the initial FISA application, which was provided to the FISC pursuant to Rule 9(a) of the FISC Rules of Procedure, and consulted with the FBI about its processing and release. The proposed application was processed for release consistently with the processing of the final version of the initial application, which was released in July 2018. The FBI understands that NSD plans to release this record prior to/in conjunction with the Defendants' renewed motion for summary judgment. The withholdings in the proposed application were made pursuant to the exemptions and for the same reasons described with respect to the final application.  Other than the lack of signatures, any other differences are in paragraphs or pages that were withheld in the final application, as justified herein, and cannot be further described on the public record without revealing information that is itself classified or otherwise exempt.

SECRET//NOFORN

SECRET//NOFORN

(42)    (U) A key to the coding system applied to the Carter Page FISA records follows:

| EXEMPTIONS AND CODED CATEGORIES | CATEGORY DESCRIPTION |
|---|---|
| **Exemption (b)(1)** | **Classified Information** |
| (b)(1)-1 | Information properly classified by an FBI Original Classification Authority pursuant to Executive Order 13526 |
| **Exemption (b)(3)** | **Information Protected by Statute** |
| (b)(3)-1 | Intelligence sources and methods, prohibited from disclosure by the National Security Act of 1947, 50 U.S.C. § 3024(i)(1) |
| **Exemptions (b)(6) and (b)(7)(C)[14]** | **Unwarranted Invasions of Personal Privacy** |
| (b)(6)-1 (b)(7)(C)-1 | Name of an FBI Special Agent |
| (b)(6)-3 (b)(7)(C)-3 | Name of an NSD employee |
| **Exemption (b)(7)(A)** | **Pending Enforcement Proceedings** |
| (b)(7)(A)-1 | Information which, if disclosed, could reasonably be expected to interfere with the pending Russia investigation |
| **Exemption (b)(7)(D)** | **Confidential Source Information** |
| (b)(7)(D)-1 | Names of or other identifying information about individuals who provided information under an express assurance of confidentiality, and any information that they provided |
| **Exemption (b)(7)(E)** | **Investigative Techniques and Procedures** |
| (b)(7)(E)-1 | Information revealing the investigative focus of an investigation |
| (b)(7)(E)-2 | Information about the collection and/or analysis of information |
| (b)(7)(E)-3 | Information that would reveal the specific techniques authorized for and used in national security investigations |
| (b)(7)(E)-4 | Information about specific databases utilized by the FBI for investigative and law enforcement purposes |
| (b)(7)(E)-5 | Information about monetary payments in relation to utilization of investigative techniques, such as the payment of confidential human sources |

---

[14] (U) Here, the FBI applied coded category (b)(6)/(b)(7)(C)-2 to protect Carter Page's privacy interests with regard to certain personally-identifying and other non-public information about him. Such information was also protected in the other three FISA packages that the FBI processed and released in response to other FOIA requests, including the FOIA request at issue in *James Madison Project et al. v. DOJ*, 17-cv-0597 (D.D.C.). On November, 9, 2018, the FBI received a privacy waiver executed by Mr. Page in which he waived his privacy interests in information about him redacted in the *James Madison Project* case and authorized its release to the public. Since the same information was protected in both this case and in the *James Madison Project* case and since he authorized release to the public, which would include plaintiff here, the FBI has determined that this waiver served to waive Mr. Page's privacy interests in this case. Accordingly, the FBI is no longer asserting Exemptions (b)(6) and (b)(7)(C) to protect Mr. Page's information. Nevertheless, this information was also protected under one or more other exemptions, including Exemptions (b)(1), (b)(3), (b)(7)(A), and/or (b)(7)(E), and accordingly, no additional information is available for public disclosure as a result of the privacy waiver.

SECRET//NOFORN

SECRET//NOFORN

| Exemptions and Coded Categories | Category Description |
|---|---|
| (b)(7)(E)-6 | Information about the targets, dates, and scope of surveillance |
| (b)(7)(E)-7 | Information that would reveal the dates and types of investigations (*i.e.*, preliminary investigations, full investigations) |
| (b)(7)(E)-8 | Information that would reveal investigative strategies for utilizing particular evidence |

### (U) *Exemption (b)(1) – Classified Information*

(43)    (U) Given that FISA applications and orders, by their nature, contain sensitive classified intelligence information, and given that the declassification of the Nunes Memo did not impact all information in the Page FISA applications and orders, it should be unsurprising that the FBI protected a relatively significant amount of information under Exemption (b)(1) here.

(44)    (U) Exemption (b)(1) protects from disclosure records that are (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and (B) in fact properly classified pursuant to such Executive Order. 5 U.S.C. § 552(b)(1).

(45)    (U) The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency information consists of two significant steps. The FBI must determine first whether the information contained in the records qualifies for classification under the applicable Executive Order governing classification and protection of national security information, and second whether the information actually has been classified in compliance with the various substantive and procedural criteria of the Executive Order.

(46)    (U) E.O. 13526 presently governs the classification and protection of information that affects the national security (*i.e.*, "the national defense or foreign relations of the United States," § 6.1(cc)), and prescribes the various substantive and procedural criteria for classifying

SECRET//NOFORN

SECRET//NOFORN

information. I am bound by its requirements when making classification determinations.

(47)    (U) For information to be properly classified, and thus properly withheld pursuant to Exemption (b)(1), the information must meet the substantive requirements set forth in E.O. 13526 § 1.1(a), which requires:

(1)    an original classification authority must have classified the information;

(2)    the information must be owned by, produced by or for, or be under the control of the United States Government;

(3)    the information must fall within one or more of the categories of information listed in § 1.4 of [the] order; and

(4)    the original classification authority must determine that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority must be able to identify or describe the damage.

(48)    (U) In addition to these substantive requirements, certain procedural and administrative requirements set forth in E.O. 13526 must be followed before information can be considered to be properly classified, such as proper identification and marking of documents. Specifically, E.O. 13526 requires that:

(a)    Each document was marked as required and stamped with the proper classification designation. *See* E.O. 13526 § 1.6(a)(1) – (5).

(b)    Each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b). *See* E.O. 13526 § 1.6(a)(5)(c).

(c)    The prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were followed.

(d)    The declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed.

(e)    Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were

SECRET//NOFORN

SECRET//NOFORN

declassified and marked for release, unless withholding was otherwise warranted under applicable law

(49)    (U)  With the above requirements in mind, I determined that the information protected pursuant to Exemption (b)(1) in the initial Page FISA application and accompanying order is currently and properly classified at the TOP SECRET or SECRET level pursuant to E.O. 13526, and satisfies both the procedural and substantive requirements set forth in the Executive Order.

(50)    (U)  Specifically, this information is owned by, was produced by or for, and is under the control of the U.S. Government; was classified by an original classification authority; meets all of the procedural requirements of E.O. 13526; and warrants classification at the TOP SECRET or SECRET level to protect "intelligence activities (including covert action), intelligence sources or methods, or cryptology," *see* E.O. 13526 § 1.4(c), and "foreign relations or foreign activities of the United States, including confidential sources," *see* E.O. 13526 § 1.4(d), because unauthorized disclosure of this information could be expected to cause exceptionally grave damage to national security (for information classified at the TOP SECRET level) or serious damage to national security (for information classified at the SECRET level). This is discussed further below.

(51)    (U)  I examined the information protected in this case pursuant to Exemption (b)(1) in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, it was evaluated with careful consideration given to the impact that its disclosure could have on other sensitive information contained elsewhere in the United States Intelligence Community's files. Equal consideration was given to the impact that other information – both in the public

SECRET//NOFORN

SECRET//NOFORN

domain and likely known or suspected by present or potential adversaries of the United States – would have upon the information protected here.

(52)   (U) The justifications for protecting classified information here were prepared with the intent that they be read with consideration given to the context in which the classified information is found.  This context includes not only the surrounding unclassified information, but also other information already in the public domain (including the three FISA applications and resulting orders released by the FBI that are outside the scope of plaintiff's FOIA request), as well as information likely known or suspected by other hostile intelligence entities.  It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to intelligence activities, sources, and methods and foreign relations/activities of the United States could reasonably be expected to harm interests that FOIA exemptions were designed to protect.

## (U) *E.O. 13526, § 1.4(c) – Intelligence Activities, Sources and Methods*

### (U) Overview

(53)   (U) E.O. 13526, § 1.4(c) authorizes the classification of "intelligence activities (including covert action), intelligence sources or methods, or cryptology."  An intelligence activity, source, or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization.  An intelligence activity, source, or method has two characteristics.  First, the intelligence activity, source, or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the use or non-use of the

SECRET//NOFORN

23

SECRET//NOFORN

activity, source, or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, source, and method are to be preserved.

(54)    (U) Intelligence activities, sources, and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities, sources, and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(55)    (U) Moreover, the U.S. Government must do more than prevent explicit references to intelligence activities, sources, and methods; it must also prevent indirect references to them. One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information. We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(U) **Information Protected In This Case**

(56)    (U) As discussed below, information withheld under Exemption (b)(1) in conjunction with E.O. 13526 § 1.4(c) would, if disclosed, reveal otherwise non-public information regarding:  the FBI's intelligence interests, priorities, activities, and methods; undisclosed intelligence sources or methods upon which the FBI relied in support of its

SECRET//NOFORN

SECRET//NOFORN

application for FISA coverage on Carter Page, as well as undisclosed portions of intelligence information provided by Source #1; and information about the use and implementation of various intelligence methods, including the specific details of the surveillance of Carter Page authorized by the FISC in response to the initial FISA application, which was publicly revealed in the HSPCI memoranda.  All of this information is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.

(U) <b>Intelligence Activities and Methods</b>

(57)    (U)  The information withheld from the initial Page FISA application and accompanying order consists of details about intelligence activities undertaken by the FBI and the methods utilized during those intelligence activities.  This information includes the details about the FISA surveillance sought and obtained through the initial Page FISA application and accompanying order, but also includes information about other intelligence activities and methods utilized by the FBI that were included in the responsive records.

(58)    (U)  With regard to the FISA surveillance of Page, the withheld information reveals the specific surveillance method(s) sought and authorized by the FISC, including citations to relevant legal authorities that would reveal the specific method(s) sought or authorized with respect to a specific individual during a particular timeframe.

(59)    (S//NF)  █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

SECRET//NOFORN

SECRET//NOFORN

(60)    (U) The withheld information also reveals:  descriptions of and the particulars about implementing the authorized surveillance method(s); information that would reveal the exact periods of FISA authorized surveillance[15]; and what information was being sought through the surveillance.

(61)    (S//NF)

---

[15] (U) This includes the FISC docket numbers and the specific dates on which coverage was sought and authorized (including as reflected in the "declassify on" dates in the classification blocks).

(U//LES)

SECRET//NOFORN

SECRET//NOFORN

(62)    (S//NF) ██████████████████████████████

(63)    (U) The withheld information also reflects intelligence-gathering activities,[16] including specific intelligence methods used and information obtained in broader contexts. This information was protected on Bates pages 8-9, 11-15, 27-28, 30-31, and 59-60.

(64)    (U) Finally, the withheld information includes information about Source #1's intelligence reporting activities and the period of time he served as an intelligence source for the FBI. While some information about Source #1 has been declassified and disclosed, other information remains classified and has not been publicly disclosed. This information was protected on Bates pages 15-20.

(65)    (U) The disclosure of the above-described types of information could reasonably be expected to cause serious damage to the national security, as it would: (a) reveal actual intelligence activities undertaken by the FBI, and the methods used in doing so, regarding

---

[16] (U) This includes information that would reveal the particular the target(s) of other FBI counterintelligence/espionage investigations during a given period of time.

SECRET//NOFORN

specific targets and during specific periods of time; (b) disclose the intelligence-gathering capabilities of the methods; and (c) provide an assessment of the level of penetration by the FBI of the specific targets during the specific time period. Armed with such information, adversaries, including hostile foreign governments, could implement actions to thwart the FBI's intelligence activities and weaken or negate the particular intelligence methods, which would severely disrupt the FBI's intelligence-gathering capabilities. Accordingly, this information is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly withheld it under Exemption (b)(1).

(66)    (U) The FBI also concluded that the specific amounts of payments made to intelligence sources reflected in the records is classified intelligence method information. Without adequate context, the particular amount paid to a particular intelligence source could be viewed to suggest the relative volume of information provided by a particular source, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's intelligence activities. Moreover, disclosure would reveal non-public information about the level of resources devoted to particular targets or subject matters. The FBI has limited resources that it must allocate strategically in order to effectively pursue its intelligence gathering mission. Revealing the amount of money the FBI has paid to particular intelligence sources and over particular periods of time would reveal the FBI's level of focus on certain intelligence gathering efforts. Revealing this level of focus would reveal how the FBI has allocated and is allocating its limited resources. If aggregated over time, this information would paint a high-level picture of the resources devoted to particular threat areas, and reveal where the FBI's strengths and weaknesses lie within

SECRET//NOFORN

the spectrum of its intelligence-gathering activities. This would give sophisticated adversaries and hostile governments the information necessary to adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI strength areas and exploit the weak ones. Accordingly, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly withheld it under Exemption (b)(1).

### (U) **Intelligence Sources**

(67)    (U) An intelligence source who requires continued classification is one that provided or is currently providing information that pertains to national security matters, the disclosure of which could reasonably be expected to result in serious damage to the FBI's intelligence-gathering capabilities.

(68)    (U) Although some information about Source #1 and his activities has been declassified and publicly disclosed, the initial Page FISA application includes information about other intelligence sources. This information, including specific information about the sources themselves as well as the information they provided, is singular in nature and, if disclosed, reasonably could be expected to identify the contributing sources.

(69)    (U) Disclosure of the identities of intelligence sources could reasonably be expected to jeopardize their livelihoods, their families and other relationships, and even their lives. Moreover, disclosure of one source can reasonably be expected to cause other current and potential intelligence sources to fear that their identities will be publicly revealed at some point. This information was protected on Bates pages 15-22.

(70)    (U) Thus, the release of source-identifying information can reasonably be expected to cause damage to the national security by causing current intelligence sources to

SECRET//NOFORN

SECRET//NOFORN

cease providing information, and discouraging potential intelligence sources from cooperating with the FBI for fear their identities would be publicly revealed at some point. Such a source reaction would eliminate one of the Intelligence Community's most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's intelligence and investigative missions. Accordingly, some of the protected intelligence source information here is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the TOP SECRET level, for intelligence source information that could reasonably be expected to cause exceptionally grave damage to the national security, and some of the protected intelligence source information here is currently and properly classified at the SECRET level, for intelligence source information that could reasonably be expected to cause serious damage to the national security. The FBI properly withheld this information under Exemption (b)(1).[17]

### (U) *E.O. 13526 § 1.4(d) – Foreign Relations or Foreign Activities*

(71)   (U) E.O. 13526, § 1.4 (d) authorizes the classification of information about foreign relations or foreign activities of the United States, including confidential sources. Such information includes information gathered from/with the assistance of and/or about foreign countries. It is sensitive due in part to the delicate nature of international diplomacy, and must be handled with care so as not to jeopardize the fragile relationships that exist between the United States and certain foreign governments.

(72)   (U) The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; the loss of the cooperation and assistance of

---

[17] (U) The intelligence source information protected in the FISC order is classified at the SECRET level only. The FISA application includes information classified at both the SECRET and TOP SECRET levels.

SECRET//NOFORN

SECRET//NOFORN

friendly nations; or the compromise of cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources. Due to the nature of the information here, the FBI cannot provide any more specific details on the public record about its basis for redacting information pursuant to E.O. 13526, § 1.4(d) and Exemption (b)(1). However, as the FBI's classified portions of this declaration demonstrate, this information is currently and properly classified and was appropriately redacted by the FBI.

(73)    (S//NF) ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(74)    (U) Thus, the FBI protected such information because, if disclosed, it could reasonably be expected to cause serious damage to national security. Because this information remains currently and properly classified, pursuant to E.O. 13526 § 1.4(c), the FBI properly protected it under Exemption (b)(1).

(U) *Exemption (b)(3) – Information Protected by Statute*

(75)    (U) Exemption (b)(3) protects information that is specifically exempted from public disclosure by a statute that requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, establishes particular criteria for withholding, or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3)(A). If the non-disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it

SECRET//NOFORN

31

SECRET//NOFORN

must specifically cite this paragraph in order for Exemption (b)(3) to apply. *Id.* at §
552(b)(3)(B).

(76)    (U)  As explained above, the initial Page FISA package includes information that
is classified pursuant to E.O. 13526 § 1.4(c) to protect intelligence sources and methods, which
the FBI has protected under Exemption (b)(1) (*see* paragraphs 60-63).  Those same intelligence
sources and methods are also exempt here under Exemption (b)(3).  Specifically, their disclosure
is prohibited pursuant to the National Security Act of 1947, as amended, which provides that the
Director of National Intelligence (DNI) "shall protect intelligence sources and methods from
unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

(77)    (U)  As relevant to the FBI's application of Exemption (b)(3), the National
Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009,
and on its face, leaves no discretion to agencies about withholding from the public information
about intelligence sources and methods.

(78)    (U)  In order to fulfill its obligation of protecting intelligence sources and
methods, the DNI is authorized to establish and implement guidelines for the Intelligence
Community ("IC") for the classification of information under applicable laws, Executive Orders,
or other Presidential Directives, and for access to and dissemination of intelligence.  50 U.S.C.
§§ 3024(i)(1).  The FBI is one of the member agencies comprising the IC, and as such must
protect intelligence sources and methods.

(79)    (U)  Accordingly, the information in the initial Page FISA application and
resulting FISC order that reveals intelligence sources and methods is prohibited from disclosure
pursuant to 50 U.S.C. § 3024(i)(1) and thus exempt from disclosure under Exemption (b)(3).

SECRET//NOFORN

SECRET//NOFORN

### (U) *Exemption (b)(7) – Law Enforcement Information*

### (U) *Threshold*

(80)    (U) The first step in applying any of Exemption (b)(7)'s subparts is to demonstrate that the records or information at issue were compiled for law enforcement purposes. 5 U.S.C. § 552(b)(7). Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement responsibility of the agency.

(81)    (U) Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government, with authority and responsibility to:  investigate all violations of federal law not exclusively assigned to another agency; conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and further the foreign intelligence objectives of the United States.

(82)    (U) As discussed previously, and as has been publicly disclosed, in July 2016, the FBI opened an investigation of the Russian government's efforts to interfere in the 2016 election. The FBI sought and obtained a FISA warrant in October 2016 to conduct surveillance of Carter Page in the course of that investigation. The application was compiled as part of the FBI's investigation of Russian election interference.

(83)    (U) The only circumstance under which the FBI can request a FISA order is when the FBI is conducting an authorized, predicated national security investigation within the scope of its law enforcement and foreign intelligence responsibilities. The Russia investigation is clearly within the law enforcement and foreign intelligence responsibilities of the FBI. Thus,

SECRET//NOFORN

SECRET//NOFORN

Exemption (b)(7)'s threshold is easily satisfied here.

(84)    (U)   Accordingly, the initial Page FISA package consists of records that were compiled in part for law enforcement purposes, and Exemption (b)(7)'s threshold is easily satisfied here.

### (U) *Exemption (b)(7)(A) – Pending Enforcement Proceedings*

(85)    (U)   Exemption (b)(7)(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(86)    (U)   Thus, to apply Exemption (b)(7)(A), the FBI must establish the existence of a pending or prospective investigation or other enforcement proceeding and must show a reasonable expectation that disclosure of the withheld information could interfere with that proceeding.

(87)    (U)   Here, the enforcement proceeding at risk is the Russian interference investigation. That investigation is pending as of the date of this filing.

(88)    (U)   The FBI, in consultation with DOJ, concluded that disclosure of a variety of information in the initial Page FISA package could reasonably be expected to interfere with the pending Russian election interference investigation if publicly disclosed at this time.

(89)    (U)   The FBI is limited in the amount of information it can provide publicly about how the investigation may be adversely affected by disclosure of this information without the explanation itself risking harm to the investigation or revealing information exempt under one or more other exemptions. Although there has been extensive media coverage of the investigation, that coverage often relies on speculation, assumptions, and anonymous/unnamed sources. Greater harm to the investigation would result from official disclosures, regardless of whether it

SECRET//NOFORN

SECRET//NOFORN

confirmed or refuted widespread media reporting. That is because official disclosure directly reveals law enforcement activity or lack thereof, removing doubts or ambiguity inherently present in other reporting.

(90)    (U) Broadly speaking, the redacted/withheld portions of the initial Page FISA package could reasonably be expected to adversely affect the pending investigation by revealing aspects of the investigation that have not previously been made public; what information or activities are or are not of interest to investigators, and areas where there may be gaps in the investigators' knowledge about such information/activities that could be exploited by targets and other adversaries; who investigators have already spoken with or interviewed and what they said (and did not say); and whether particular persons or entities are or are not of interest in the investigation.

(91)    (U) Moreover, the FBI has explained herein why particular types of information contained in the four Page FISA applications and accompanying orders are exempt under other exemptions because of the harm associated with disclosure. While Exemption (b)(7)(A) considers the impact on a specific investigation or investigations, the big-picture risks to law enforcement, national security, and privacy interests addressed by the other exemptions are relevant here, and indeed are more immediate here.

(92)    (U) Disclosing information that would identify confidential and/or classified intelligence sources or other individuals who are or could become witnesses risks their compromise through efforts to discredit, harass, or even threaten them. This, in turn, creates the risk of curtailing their further cooperation, which can significantly hamper an investigation.[18]

---

[18] (U) The harms in disclosing information about and from confidential sources is discussed further in the Exemption (b)(7)(D) discussion below.

SECRET//NOFORN

SECRET//NOFORN

(93)    (U)  Similarly, disclosing the evidence, information, or intelligence (including source reporting) already obtained by/known to the FBI risks influencing, compromising, or tainting testimony by other witnesses and/or the fabrication of other information/falsification of other testimony for the purpose of countering or undermining the credibility of the evidence, information, or intelligence already gathered.  It would also reveal gaps in the FBI's knowledge of information, intelligence, or source reporting/witness testimony, which risks destruction or adulteration of evidence or fabrication of false evidence, and attempts to intimidate or improperly influence of the potential sources/witnesses.

(94)    (U)  Disclosing the investigative techniques already used in this case during specific time periods[19] and regarding specific subject matter areas creates a risk of revealing what investigators already know, what they do not or may not know yet, who is or may be of interest to investigators, and who may be cooperating in the investigation, which, for all reasons discussed above, would adversely affect the investigation.  Moreover, providing details about the use of those techniques risks efforts by targets, subjects, and other adversaries to undermine or thwart the techniques.[20]

---

[19] (U)  Included here would be the FISC docket numbers.  If aggregated with each other and/or other FISC docket numbers, they could be used to pinpoint the times of FISA coverage on Page, which creates the risks discussed here in the Exemption (b)(7)(A) analysis, as well as those in the analysis of Exemption (b)(7)(E), and particularly category (b)(7)(E)-6, below.

(U) Disclosing the use of specific techniques during identified timeframes would allow targets and potential targets to determine the probability that the FBI is aware of particular information likely to be obtained through such techniques during that time as well as the probability that the FBI may not be aware of the information. Such knowledge could allow targets, potential targets, and others intent on disrupting the investigation to better target their activities toward, for example, creation or destruction of evidence, fabrication of cover stories, intimidation of witnesses, etc.

[20] (U)  The risks of circumvention are discussed further in the Exemption (b)(7)(E) descriptions below.

SECRET//NOFORN

SECRET//NOFORN

(95)    (U) Consistent with its standard practices, the FBI and SCO have not publicly identified the specific scope/focus of, subjects of, witnesses/sources in, or evidence/information from its pending Russia investigation, beyond the information made public through criminal justice proceedings.  To the extent that information made public in those criminal proceedings exactly matched information in the four Page FISA packages processed in this case, it was not redacted.  Moreover, while unclear that HSPCI's disclosures of the Nunes and Schiff Memos legally precluded the FBI's ability to assert FOIA exemptions over matching information in the initial Page FISA package responsive to plaintiff's request and processed here, the FBI nevertheless did not redact any exactly matching information.  Furthermore, the FBI carefully considered whether to disclose similar information that was not an exact match to the memoranda, and asserted Exemption (b)(7)(A) only upon concluding that disclosure of the non-matching information could reasonably be expected to harm the investigation.

(96)    (U) For the reasons discussed above, combined with the justifications for protecting information under the other exemptions discussed herein, the FBI concluded that disclosure of information marked as "(b)(7)(A)-1" could reasonably be expected to interfere with the pending investigation being conducted by the SCO with the assistance of the FBI.  Accordingly, the FBI withheld that information pursuant to Exemption (b)(7)(A).

(U) *__Exemptions (b)(6) and (b)(7)(C) – Unwarranted Invasions of Personal Privacy__*

(97)    (U) Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

(98)    (U) Exemption (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to

SECRET//NOFORN

SECRET//NOFORN

constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

(99)    (U) The FBI conjunctively asserts Exemptions (b)(6) and (b)(7)(C) as they provide overlapping protections for personal privacy. Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. Each exemption balances individuals' privacy interests against the public's interest in disclosure.

(100)    (U) For purposes of both exemptions, a public interest exists only when information would significantly increase the public's understanding of the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats; uphold and enforce the criminal laws of the United States; and provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.

(101)    (U) The FBI has relied on Exemptions (b)(6) and (b)(7)(C) here to protect the names of or information about an FBI Special Agent, a FISC employee, and an NSD employee; information sufficient to identify a third party who was the source of some information relied upon in the initial Page FISA application; and certain personally-identifying and other non-public private information about Carter Page.

(U) **(b)(6)/(b)(7)(C)-1**        **FBI Special Agent**

(102)    (U) The FBI withheld the name of the FBI Special Agent who signed the initial Page FISA application responsive to plaintiff's request. This Special Agent was assigned to the pending Russia investigation during the period covered by the initial Page FISA application and is an experienced counterintelligence agent.

SECRET//NOFORN

SECRET//NOFORN

(103)  (U)  The FBI regularly protects the identities of its Special Agents.  FBI agents have access to information regarding official law enforcement investigations, and therefore may become targets of harassing inquiries for unauthorized access to information regarding such investigations if their identities were released.  This is particularly true of agents who work national security cases, including counterintelligence cases, who have access to some of the most sensitive and highly classified information possessed by the FBI.  Assignments of agents to any particular investigation or matter are not by choice.  Publicity (adverse or otherwise) regarding a specific investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations.  FBI agents also have privacy interests in being free from unnecessary, unofficial questioning regarding their conduct in particular investigations, whether or not they are currently employed by the FBI.  For example, an individual investigated by the FBI may carry a grudge and may seek revenge on the agents involved in that investigation.

(104)  (U)  Many of these concerns are heightened when the agents whose identities are protected work counterintelligence cases.  The FBI's counterintelligence mission involves protecting the secrets of the U.S. Intelligence Community from risks of espionage and insider threats; protecting the nation's critical assets; and countering the activities of foreign spies.  FBI counterintelligence investigations involve significant threats to the national security of the United States by foreign intelligence services and other hostile government actors.  FBI agents responsible for conducting these investigations can be exposed to real and substantial threats to their lives and safety, and the FBI's concerns about targets of such investigations holding grudges against such agents are more acute when those targets are foreign intelligence officers from hostile governments.

SECRET//NOFORN

SECRET//NOFORN

(105)  (U)  Here, the above-described reasons led the FBI to conclude that the Special Agent whose name is protected here has substantial privacy interests.  That determination is further bolstered by the fact that the investigation and specific investigative activity at issue here are very high-profile and have been the subject of substantial media attention and speculation.

(106)  (U)  In contrast, there is no public interest to be served by disclosing the Special Agent's name because the name would not, by itself, significantly increase the public's understanding of the FBI's operations and activities with respect to obtaining the initial FISA-approved surveillance on Page, the conduct of the Russia investigation *writ large*, or any other FBI operations or activities.

(107)  U)  In the absence of a public interest, the Special Agent's substantial privacy interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C). Accordingly, the FBI properly protected the name of its Special Agent.[21]

(U)  **(b)(6)/(b)(7)(C)-3**        **NSD Employee**

(108)  (U)  The information falling within this category consists of the name of the NSD attorney who signed and submitted the initial Page FISA application to the FISC.  This employee is not an executive-level employee.  The FBI regularly protects the names and identities of employees of other Government agencies or offices who are identified in FBI law enforcement records.  The reasons for doing so are similar to the FBI's reasons for protecting the name of its Special Agent as detailed above.

(109)  (U)  Here, the NSD employee is in a position to access highly-sensitive and classified information concerning counterintelligence and counterterrorism matters, and so could

---

[21]  (U)  This Special Agent is not an executive-level employee.

SECRET//NOFORN

SECRET//NOFORN

become a target of harassing inquiries for unauthorized access to non-public information about the Page FISAs specifically, or more generally, non-public information about other FISC matters, FBI investigations, or IC intelligence activities. Disclosure of the employee's identity would also risk hostile action by adverse foreign powers, either by way of revenge or of actively targeting the employee in intelligence-gathering operations.

(110)  (U)  In contrast, there is no public interest to be served by disclosing this employee's identity because it would not, by itself, significantly increase the public's understanding of the FBI's operations and activities with respect to obtaining the initial FISA-authorized surveillance on Page, the conduct of the Russia investigation *writ large*, or other FBI operations or activities.

(111)  (U)  In the absence of a public interest, this employee's substantial privacy interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C). Accordingly, the FBI properly protected the name of the NSD employee.[22]

### (U)  *Exemption (b)(7)(D) – Confidential Source Information*

(112)  (U)  Exemption (b)(7)(D) protects records or information compiled for law enforcement purposes when disclosure:

> could reasonably be expected to disclose the identity of a
> confidential source, including a State, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement authority in the course of
> a criminal investigation or by an agency conducting a lawful
> national security intelligence investigation, information furnished
> by the confidential source.

---

[22] (U) Information about this employee was also redacted pursuant to Exemptions (b)(6) and (b)(7)(C) at NSD's request.

SECRET//NOFORN

SECRET//NOFORN

5 U.S.C. § 552(b)(7)(D). Exemption (b)(7)(D) provides categorical protection for the identities of confidential sources, as well as information provided by such a source in a criminal or national security investigation. No balancing of interests is required and the public's interest in the information is not a factor. Rather, once the FBI establishes that the source provided information under express or implied assurances of confidentiality, the identity of the source and all information the source provided in a criminal or national security investigation are exempt under Exemption (b)(7)(D).

(113)  (U)  The FBI regularly relies on confidential sources. Confidential sources may provide information under express assurances of confidentiality, and are "informants" within the common meaning of the term, although the FBI refers to them as "Confidential Human Sources" or "CHSs." Alternatively, confidential sources may provide information under circumstances from which assurances of confidentiality may be inferred. In either situation, these sources are considered to be confidential because they furnish information only with the understanding that their identities and the information they provided will not be divulged outside the FBI. Information provided by these sources is singular in nature, and if released, could reveal their identities. Sources must feel free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public and that they may, as a result, face reprisals. Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

(114)  (U)  The release of a source's identity could forever eliminate that source as a future means of obtaining information, and also has a chilling effect on the cooperation of other sources. Revealing the identities of confidential sources risks one of the FBI's most important

SECRET//NOFORN

SECRET//NOFORN

means of collecting information and intelligence, and severely hampers law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal and national security laws.

(115)  (U)  As a result of the declassification of the Nunes Memo, and the release of both of the HSPCI memoranda, it was publicly revealed that the FBI relied on a confidential and classified intelligence source, referred to throughout the Page FISA applications as "Source #1." The FBI has not protected information about this source's identity, nor has it protected information he provided that matches information revealed in the HPSCI memoranda or the Grassley/Graham letter. The FBI has protected information that would identify the identities of other confidential sources who provided information or intelligence to the FBI; information provided by those sources; and information provided by Source #1 that does not match information revealed in the HPSCI memoranda or the Grassley/Graham letter.

(116)  (U)  Source #1 was a code-named CHS for the FBI. By definition, such sources are confidential. That is, as part of the FBI's protocols for CHSs, they are provided express assurances of confidentiality. Moreover, Source #1 provided information in furtherance of a sensitive national security investigation being conducted by the FBI. Accordingly, under the second clause of Exemption (b)(7)(D), any information he provided is categorically exempt. Thus, except as to information that matches information revealed in the HPSCI memoranda or the Grassley/Graham letter, the FBI redacted all information provided by Source #1. This information was protected on Bates pages 10, 16-20, and 22.

(117)  (U)  The initial FISA application also contains information about and from other sources who cooperated with and provided information to the FBI under express assurances of confidentiality. Further description of the bases for this conclusion cannot be discussed publicly

SECRET//NOFORN

SECRET//NOFORN

without disclosing information that is exempt under this or one of the other exemptions cited in relation to this information.  However, because these sources cooperated with and provided information to the FBI in furtherance of a national security (intelligence) investigation under express assurances of confidentiality, the requirements of Exemption (b)(7)(D) are satisfied and the FBI properly protected information that would reveal the identities of the sources, as well as the information that they provided to the FBI.  This information was protected on Bates pages 8-9, 15-17, and 27-28.

(118)  (S//NF)  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

## (U) *Exemption (b)(7)(E) – Investigative Techniques and Procedures*

(119)  (U)  Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when release] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  This exemption affords categorical protection to techniques and procedures used in law enforcement investigations.  It protects techniques and procedures that are not well-known to the public as well as non-public details about the use of publicly-known techniques and procedures.

SECRET//NOFORN

SECRET//NOFORN

## (U) **(b)(7)(E)-1**        **Investigative Focus**

(120)   (U)   Many investigative steps preceded the FBI's FISA applications; the initial Page FISA package reveals how the FBI conducted certain aspects of the investigation to that date and a road-map of certain contemplated investigative steps (*i.e.*, the requested surveillance). Although the general techniques authorized by the FISA are publicly known, this detailed information about how, when, where, and why such authorities are employed in a particular investigation is not publicly known. This type of detailed information would be valuable to criminals and adversaries as a guide to adjusting their behaviors, taking evasive actions, and developing countermeasures to thwart FBI investigations. Accordingly, the FBI protected this information under Exemption (b)(7)(E) in order to the risk of circumvention posed by disclosure of this information.

## (U) **(b)(7)(E)-2**        **Collection and/or Analysis of Information**

(121)   (U)   Category (b)(7)(E)-2 includes information that reveals the methods used by the FBI to collect and analyze information it obtains for investigative purposes.[23]

(122)   (S//NF)   ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

---

[23] (U) This information overlaps with the information protected in category (b)(7)(E)-3, which protects specific investigative techniques authorized and utilized in national security investigations inasmuch as the FBI's methods for collecting information and the types of techniques it is authorized to use in national security investigations will, in the context of these records, generally be the same thing. The FBI cited category (b)(7)(E)-3 in every instance that it cited category (b)(7)(E)-2.

SECRET//NOFORN

SECRET//NOFORN

(123)  (U)  The release of this information would disclose the methods used in the collection and analysis of information, including how and from where the FBI collects particular types of information and the methodologies employed to analyze it once collected.  Such disclosures would enable subjects of FBI investigations to identify when these or similar techniques are used and then take evasive actions or countermeasures to circumvent them.  This would diminish the relative utility of these techniques and facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained.  Accordingly, to protect the viability of these techniques, the FBI protected this information under Exemption (b)(7)(E).

## (U)  **(b)(7)(E)-3**      **Specific Techniques Authorized for and Used in National Security Investigations**

(124)  (U)  The FBI protected information that would reveal the specific techniques that the FBI is authorized to and in fact uses in national security investigation.  In this context, the techniques were referenced because they were used in the context of *this* national security investigation but their disclosure here would also have ramifications for the use of these techniques in other national security cases.  The FBI has a toolbox of investigative techniques that it uses in national security (counterintelligence and counterterrorism) cases, which overlap in many respects with its criminal investigative toolbox, although the FBI obviously has one significant and different tool in the national security toolbox – FISA.  This category covers non-public information about all of the techniques referenced in the initial Page FISA package, including those that have not been publicly disclosed in relation to investigative actions taken in this investigation; those that have been publicly disclosed in relation to this investigation, such as

SECRET//NOFORN

SECRET//NOFORN

CHSs; and those under the FISA that the FISC authorized the FBI to use here. Although techniques authorized by the FISA are publicly known, this detailed information about how, when, where, and why such authorities are employed in a particular investigation is not publicly known.

(125)  (S//NF)

(126)  (U)  Here, the context in which these techniques are discussed reveals details about when in an investigation a particular technique might be utilized, the types of information that might be sought via the technique, and the limitations on its use and/or utility; what techniques might be used in combination; and non-public information about how the techniques are implemented.    When aggregated, as it is here, this information can paint a road-map of how a national security, and in particular a counterintelligence investigation, is conducted.[24] Disclosure of such a road-map here and over time would give sophisticated criminals and adversaries the information necessary to adjust their activities and take effective countermeasures to circumvent the FBI's investigative and intelligence-gathering efforts. Accordingly, the FBI protected this information under Exemption (b)(7)(E) here.

---

[24]  (U) The FISA applications explain the investigative steps taken prior to seeking FISA coverage, as well as the information that the FBI was able to obtain using them, which formed the probable cause necessary to obtain a FISA warrant.

SECRET//NOFORN

SECRET//NOFORN

(U) **(b)(7)(E)-4**      **Specific Databases Used by the FBI for Investigative and Law Enforcement Purposes**

(127)   (U)  The FBI protected its use of non-public databases that it relied on to obtain/confirm information and intelligence gathered in the course of its investigation.  These databases are accessible to law enforcement personnel to conduct queries of or for particular types of information for law enforcement and intelligence gathering purposes.  The databases protected include those exclusive to the FBI as well as others that are available to other Federal Government law enforcement personnel.  These databases allow the FBI to query already-gathered information in order to corroborate or refute it, and/or obtain new or additional information in order to develop investigative leads.   It is not publicly known when and under what circumstances the FBI utilizes these particular databases, particularly in the context of a national security/counterintelligence investigation.  Armed with such information, spies, criminals, and others intent on avoiding FBI attention could develop countermeasures to avoid detection, which would impede the FBI's ability to effectively conduct national security and criminal investigations.

(U) **(b)(7)(E)-5**      **Monetary Payments in Relation to Utilization of Investigative Techniques**

(128)   (U)  The FBI protected specific information about payments to CHSs on two pages of the initial FISA application.  While it is publicly known that the FBI pays CHSs under some circumstances, the details of when, for what, and how much CHSs are paid are aspects of this technique that are not made public, in order to protect the viability of the technique.  Without adequate context, the particular amount paid to a CHS could be viewed to suggest the relative volume of information provided by a particular CHS, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have

SECRET//NOFORN

SECRET//NOFORN

come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's activities.

(129)  (U)  Finally, disclosing the amounts paid to CHSs in a particular investigation or for particular types of information would reveal non-public information about the level of resources devoted to particular investigations or subject matters.  The FBI has limited resources that it must allocate strategically in order to effectively pursue its law enforcement and intelligence gathering missions.  Revealing the amount of money the FBI has paid to particular CHSs in particular investigations and over particular periods of time would reveal the FBI's emphasis on certain investigations or intelligence gathering efforts.  Revealing this emphasis would reveal how the FBI has allocated and is allocating its limited resources.  If aggregated over time, this information would paint a high-level picture of the resources devoted to particular types of investigations or particular FBI threat areas, and reveal where the FBI's strengths and weaknesses lie within the spectrum of its intelligence gathering and criminal investigative activities.  This would give sophisticated criminals and adversaries the information necessary to adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI strength areas and exploit the weak ones.  Accordingly, the FBI protected payment information under Exemption (b)(7)(E) in this case.

(U)  **(b)(7)(E)-6**        **Targets, Dates, and Scope of Surveillance**

(130)  (U)  While it is known that the FBI conducts surveillance authorized under the FISA, as well as other types of authorized surveillance, and while it is known that there was surveillance conducted here, the details about how the surveillance was implemented (investigatively and/or technically), the locations targeted by the surveillance, and the specific time period(s) during which the surveillance was conducted are not public and were not

SECRET//NOFORN

SECRET//NOFORN

disclosed in the HPSCI memoranda.[25] These non-public details about the conduct of surveillance, particularly surveillance authorized under the FISA, are utilized by the FBI in other current investigations. Disclosure of non-public details about when and how the FBI conducts surveillance and the circumstances under which the FBI will seek authority to do so would, over time, create a mosaic that criminals and other adversaries could use to predict when and where surveillance may occur, detect it when it is occurring, and develop and utilize countermeasures to defeat or avoid different types of surveillances. Accordingly, the FBI protected this information under Exemption (b)(7)(E) in the initial FISA package to preserve the usefulness and utility of this technique.

## (U) **(b)(7)(E)-7**        **Dates and Types of Investigations**

(131)  (U)  On one page in the initial FISA application, the FBI protected information that, when referenced in connection with an actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation, and the time period of the particular investigation. Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation and the particular dates that the investigation covers, which would allow targets to identify what activities might be under investigation and to adjust their behavior accordingly. Moreover, the knowledge that a specific activity in general warrants investigation

---

[25] (U) This includes, for example, the FISC docket numbers, the specific dates that the FISA applications were filed and orders issued, and the declassification dates in the classification stamps (which can be used to pinpoint the dates of the applications and orders). All of this information reveals the specific time period(s) under which the surveillance was conducted.

(U//LES)

SECRET//NOFORN

SECRET//NOFORN

could likewise cause individuals to adjust their conduct to avoid detection. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

(U) **(b)(7)(E)-8**        **Investigative Strategies for Utilizing Particular Evidence**

(132)   (U) The FBI protected information describing a particular purpose for which it might use information gathered as a result of its FISA-authorized surveillance on Page. This information reflects non-public information about how the FBI investigatively uses information that it gathers during an investigation. While the particular context here concerns information gathered as a result of its utilization of FISA, the same potential uses of investigative information could be present in many other contexts. Publicly disclosing this information would permit targets of FBI investigative activities to anticipate FBI investigative activities, and this in turn would permit them to take countermeasures against such activities. This would abrogate the usefulness of FISA as a technique, at least in this particular and important regard, as well as the investigative activities that may flow as a result of information obtained under FISA. No further information about this category of information or how it falls within Exemption (b)(7)(E) can be made on the public record without undermining the FBI's assertion of this exemption, as well as Exemptions (b)(1), (b)(3), and (b)(7)(A), which were also asserted to protect this information.

(133)   (S//NF)

SECRET//NOFORN

SECRET//NOFORN

### (U) SEGREGABILITY DETERMINATIONS FOR RELEASED IN PART PAGES

(134)    (U) Each page of the four Page FISA applications and accompanying orders was carefully reviewed by a team of DOJ employees to determine what portions of the pages contained exempt information requiring redaction pursuant to the FOIA, what portions could be segregated and released, and what pages did not contain any segregable information and had to be withheld in full.  As part of this review, the employees carefully analyzed all information in the Page FISA applications and orders to determine what information has been revealed through the HPSCI memoranda and/or officially, publicly disclosed, and to ensure that no information for which FOIA exemptions were or likely have been waived was redacted.  A total of 598 pages of responsive records were carefully reviewed and analyzed; 412 pages were released and 186 pages were withheld.

(135)    (U) As relevant here, only the initial package falls within the scope of plaintiff's request.  That package consists of 83 released pages, two of which were released in full and 81 of which were released in part.[26]  Once all exempt information under all applicable exemptions was redacted, no additional information was available for release either because it was inextricably intertwined with exempt information or because release would result is nothing more than the disclosure of random words or disjointed phrases lacking any informational content.

### (U) PAGES WITHHELD IN FULL – PAGE FISAS

(136)    (U) The FBI withheld in full 186 pages associated with the four FISA applications and resulting orders pursuant to Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E)

---

[26] (U) As previously explained, in processing all four FISA packages, the FBI withheld in full 186 pages. However, the FBI cannot publicly disclose how many, if any, of those pages were associated with the first application and thus withheld in response to plaintiff's request, for the reasons explained in this declaration. *See ¶* 28 *supra.* and *¶¶* 136-142 *infra.*

SECRET//NOFORN

(categories 1-3 and 6). Disclosure of these pages would reveal classified intelligence methods and law enforcement techniques; however, the FBI cannot publicly describe these pages and the bases for withholding them any further without revealing information that is itself exempt.

(137)  (S//NF) ███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████

█████████████████████████████████

(138)  (S//NF) ████████████████████████

████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████

(139)  (S//NF) ██████████████████████████████

██████████████████████████████████

█████████████████████████████████

████████████████████████████████

(140)   (S//NF)

(141)   (S//NF)

SECRET//NOFORN

(142)  (S//NF)

**(U) PAGES WITHHELD IN FULL – OTHER RECORDS RESPONSIVE TO ITEMS 1, 2, AND 6**

(143)   (U)  As previously noted, records responsive to these items were located through CRS and electronic searches.  The FBI has withheld these responsive records in full pursuant to FOIA Exemption (b)(7)(A), although all of them are subject to withholding in whole or in part based on other exemptions as well, including but not limited to Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  The briefing schedule in this case permits the FBI to defend only the Exemption (b)(7)(A) withholdings at this time and if unsuccessful, to assert and defend the other exemptions later.

SECRET//NOFORN

SECRET//NOFORN

(144)  (U)  These responsive records satisfy Exemption (b)(7)'s threshold requirement because they were compiled as part of a law enforcement investigation within the law enforcement duties of the FBI to detect and undertake counterintelligence and national security investigations, and to investigate possible violations of Federal criminal laws. *See* 28 U.S.C. § 533. Specifically, they were created or compiled as part and in furtherance of the Russian election interference investigation. Thus, they readily meet the threshold for applying FOIA Exemption (b)(7)(A).

(145)  (U)  Next, to apply Exemption (b)(7)(A), the FBI must establish the existence of a pending or prospective investigation or other enforcement proceeding. Since these records were compiled as part and in furtherance of the Russian election interference investigation, which is still pending, this element has also been satisfied.

(146)  (U)  Finally, the FBI must establish that disclosure of responsive records could reasonably be expected to interfere with the pending enforcement proceeding. The FBI has determined that disclosure of any responsive records in the midst of this sensitive, on-going investigation could reasonably be expected to interfere with the investigation.[27]

(147)  (U)  Providing a document-by-document *Vaughn* index or description of the responsive records would undermine the very interests that the FBI seeks to protect under Exemption (b)(7)(A). Specifically, identifying the precise number of records or describing their contents would reveal non-public information about the investigation that could cause harm to

---

[27] (U) In making this determination, the FBI considered whether any official public disclosures about the investigation have affected its ability to apply Exemption (b)(7)(A) to the responsive records located in this case. The FBI has concluded that none of the information officially and publicly disclosed as of the date of this declaration exactly matches the records responsive to Items 1, 2, or 6 located here. Accordingly, notwithstanding various official public disclosures related to the pending Russian election interference investigation generally and the Page FISAs specifically, the FBI's ability to assert Exemption (b)(7)(A) here has not been waived.

SECRET//NOFORN

SECRET//NOFORN

the investigation or could cause other harms protected against by FOIA exemptions (such as revealing classified information, intelligence source and method information, or other law enforcement sensitive information). As further elucidated below, premature disclosure of such information in the context of this active and sensitive investigation could reasonably be expected to adversely affect it. Similarly, disclosing the total volume of responsive information protected by Exemption (b)(7)(A) would reveal information about the nature, scope, focus, and conduct of the investigation, as well as indicate the relative success or lack thereof of the FISA-authorized surveillance of Page during a particular (and rather narrow) period of time, and thus cannot be publicly disclosed without undermining the law enforcement interests the FBI is seeking to protect by application of Exemption (b)(7)(A) in this case and/or without revealing classified and other law enforcement-sensitive information.

(148)   (U) In order to protect the significant law enforcement interests here, the FBI has generally described the records responsive to Items 1, 2, and 6 of the request for which the FBI is categorically asserting Exemption (b)(7)(A). The FBI then assigned each type of record to a functional category and explained how disclosure of information from that functional category is reasonably expected to interfere with the FBI's pending investigation and any resulting prosecutions/enforcement proceedings. In conducting this analysis, the FBI reviewed the responsive records in order to categorize them properly, assigned them to the appropriate functional categories, and determined that no non-exempt information exists that can be segregated and released without adversely affecting the FBI's pending investigation and any prospective prosecutions/enforcement proceedings, other than the information that is in the public version of this declaration.

SECRET//NOFORN

SECRET//NOFORN

(149)  (U)  The following types of records were located in response to Items 1, 2, and 6 of plaintiff's request:

(U)  FD-1057, Electronic Communications (or "ECs")[28]

(U)  E-mails[29]

(U)  Spreadsheets[30]

(U)  Memoranda/Reports[31]

(150)  (U)  The FBI then categorized each type of record into the following functional categories:

(A)  (U)  Investigative Information – *i.e.*, the records reflect or discuss investigative methods or procedures utilized or anticipated by the FBI.

(B)  (U)  Substantive Information – *i.e.*, the records reflect, summarize, or analyze substantive intelligence information obtained by the FBI, or identify substantive intelligence information to be sought or evidence to be

---

[28] (U)  An EC is the primary vehicle of correspondence within the FBI. The purpose of an EC is to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network. They are generally used when no action is necessary and when the recorded information is non-testimonial. These forms are often utilized to record and disseminate intelligence/investigative information and for general investigation administration purposes.



(S//NF)

[29] (S//NF)  This category includes but is not limited to e-mails containing intelligence information, internal deliberations, and administrative taskings. Specifically,

[30] (S//NF)

[31] (S//NF)  Various types of memoranda and reports responsive to plaintiff's request were located, to include

SECRET//NOFORN

SECRET//NOFORN

obtained by the FBI.

    (C)    (U) Administrative Information – *i.e.*, the records reflect administrative taskings and activities of FBI personnel, including Special Agents and/or Intelligence Analysts.

(151)  (U) Each responsive record in this case, and the information contained in each record, falls into one or more of these categories. For example, a single record – *e.g.*, an EC – may serve multiple purposes, such as documenting an investigative method, intelligence information obtained through the method, and administrative taskings to personnel regarding the method or intelligence information. Therefore, the EC itself could be included in all three categories, as could particular pieces of information contained in the document.

(152)  (U) The following paragraphs describe the harm that is likely to result from releasing (or even disclosing any further information about) the responsive records that fall within each functional category.

(U) ***Reasonable Expectation of Harm from Disclosure of Investigative Information***

(153)  (S//NF) This category includes information that would reveal ███████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████This is not information that has been previously disclosed and revealing it here would

SECRET//NOFORN

SECRET//NOFORN

provide further, non-public details about the scope and focus of the Russian election interference investigation generally and of the investigation of Page specifically.

(154)  (U) Disclosure of the above-described information would arm subjects, persons of interest, and others intent on obstructing the investigation with the information necessary to take defensive actions to conceal their activities; elude detection and surveillance; suppress, destroy, or fabricate evidence; and/or interfere or attempt to interfere with or intimidate witnesses or other sources of information.

(U) ***Reasonable Expectation of Harm from Disclosure of Substantive Information***

(155)  (S//NF) This category includes ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ This information was compiled as part and in furtherance of the pending Russian interference investigation.

(156)  (S//NF) Disclosure of this substantive information at this time would undermine the pending investigation and any pending or prospective prosecutions/enforcement proceedings by prematurely revealing ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

SECRET//NOFORN

SECRET//NOFORN

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████ As with the Investigative

Information category, disclosure of the information in this category would provide those intent

on interfering with the pending investigation with the information necessary to take defensive

actions to conceal their activities; elude detection and surveillance; suppress, destroy, or fabricate

evidence; and/or interfere or attempt to interfere with or intimidate witnesses or other sources of

information.

### (U) *Reasonable Expectation of Harm from Disclosure of Administrative Information*

(157)   (S//NF)  This category includes information that is more administrative in nature

but is no less sensitive because it reflects things such as ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████ From a high level, this

information generally reflects routine taskings of employees but because of the specific context

and substantive information associated with it, disclosure here could reasonably be expected to

cause all of the same harms as the disclosure of information from the Investigative Information

and Substantive Information categories as discussed above.  While in the context of an

administrative tasking there may be some seemingly innocuous information, that information

SECRET//NOFORN

SECRET//NOFORN

must nonetheless be protected based on the context and circumstances here. Specifically, these records pertain to the use of a highly sensitive intelligence and investigative technique, most of the details of which remain classified even here where the existence of this particular FISA was declassified, in the course of a pending national security investigation. Even seemingly innocuous bits of information can be mined for analysis by hostile intelligence actors and other adversaries in order to piece together a larger picture of either this investigation or of the FBI's use of the technique more broadly. They could then use that picture, along with other information available to them, to anticipate intelligence/investigative strategies and to develop countermeasures, whether in this case or others.

(158)    (U)  For the reasons set forth above, therefore, the FBI has categorically protected all records located in response to Items 1, 2, and 6 of plaintiff's request (other than the initial Page FISA package itself) pursuant to FOIA Exemption (b)(7)(A).

## (U) PART III:
## PARTIAL GLOMAR RESPONSES

(159)    (U)  The FBI relies on a Glomar response in instances in which, assuming that responsive records existed, even acknowledging their existence would result in harm protected against by one or more FOIA exemptions. To be credible and effective, the FBI must use a Glomar response in all similar cases regardless of whether responsive records actually exist, including instances in which the FBI does not possess records responsive to a particular request. If the FBI were to invoke a Glomar response only when it actually possessed responsive records, the Glomar response would be interpreted as an admission that responsive records exist.

(160)    (U)  Here, the FBI is relying on partial Glomar responses in two contexts:  (1) as to the existence or non-existence of any records of electronic surveillance within the scope of its

SECRET//NOFORN

SECRET//NOFORN

request other than the Carter Page FISAs discussed previously and the "no records" response regarding the wiretapping alleged in President Trump's March 4, 2017 tweets, and (2) as to the existence or non-existence of records related to the FISA-approved surveillance of Carter Page described in Items 3-5 of plaintiff's request to the FBI. The FBI has determined that merely acknowledging the existence or non-existence of such records could trigger harm under FOIA exemptions.

(161) (U) With limited exceptions, such as the unique circumstances giving rise to the FBI's processing and release of the four Page FISA applications and resulting orders, the FBI does not and cannot publicly confirm or deny FISA coverage on particular individuals or entities, or that FISC orders have been sought or obtained in the conduct of any particular investigation. The FBI similarly does not publicly confirm or deny whether it is or has conducted electronic surveillance authorized under other authorities during a pending investigation. As no authorized Executive Branch official has acknowledged the existence or non-existence of electronic surveillance records within the scope of plaintiff's request other than those materials acknowledged and discussed herein, the FBI's partial Glomar response as to any other responsive records remains proper.

(162) (U) As an original classification authority, I have determined that the FBI can neither confirm nor deny whether the FBI maintains responsive records about FISA-authorized surveillance, whether against other targets or against Carter Page as described in Items 3-5 of plaintiff's request, because to do so could reasonably be expected to compromise national security and/or reveal intelligence activities, sources, or methods. *See* 5 U.S.C. §§ 552(b)(1), (b)(3).

SECRET//NOFORN

SECRET//NOFORN

(163)  (U)  Moreover, acknowledging or denying the existence or non-existence of any other responsive records could result in harms protected against by FOIA Exemption (b)(7)(A), 5 U.S.C. § 552(b)(7)(A).

(A)    (U)  As previously described, on March 20, 2017, then-FBI Director Comey publicly confirmed the existence of an investigation into Russia's interference in the 2016 Presidential election.  *See* Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation).  On May 17, 2017, the Acting Attorney General appointed Special Counsel Mueller and authorized him to conduct the investigation confirmed by then-FBI Director Comey on March 20, 2017.   DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)).

(B)    (U)  Plaintiff's request for electronic surveillance records covers a period of time during which the Russian election interference investigation has been pending.  Thus, to the extent that plaintiff's request seeks electronic surveillance records related to this investigation, other than those that have been acknowledged and processed, the FBI cannot confirm or deny their existence or non-existence because that could reasonably be expected to adversely affect the pending investigation.

(C)    (U)  To the extent that plaintiff's request implicates some other investigation, responsive records – if they exist – would likely also be related to a pending investigation given the facts, circumstances, and timing of this request.  Confirming or denying that the FBI does or does not possess responsive records would require the FBI to reveal sensitive investigative information that could reasonably be expected to adversely affect any

SECRET//NOFORN

SECRET//NOFORN

such pending investigation.

(164)   (U)   Finally, acknowledging the existence or non-existence of any other responsive records could reasonably be expected to risk circumvention of the law. *See* 5 U.S.C. § 552(b)(7)(E).

(U)   **FOIA EXEMPTION (b)(1) AS A BASIS FOR THE GLOMAR RESPONSE**

(165)   (U)   FOIA Exemption (b)(1) protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

(166)   (U)   E.O. 13526 § 1.1(a) provides that information may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in § 1.4 of E.O. 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

(167)   (U)   E.O. 13526 explicitly authorizes precisely the type of response that the FBI has provided to plaintiff in this case. Specifically, § 3.6(a) provides that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."

(168)   (U)   Consistent with E.O. 13526 and as described below, I have determined that acknowledging the existence or nonexistence of FISA records responsive to plaintiff's request,

SECRET//NOFORN

beyond the initial Page FISA package and the "no records" response as to the March 4th tweets, would require the FBI to disclose properly classified facts that concern § 1.4(c) ("intelligence activities, sources, and methods") and § 1.4(d) ("foreign relations and foreign activities of the United States"). Moreover, responsive records, if they exist, would be owned by and under the control of the U.S. Government. Finally, I have determined that acknowledging the existence or non-existence of the requested records reasonably could be expected to result in damage to national security.[32]

(169)  (U)  My determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.

### (U) *Intelligence Activities, Sources, and Methods*

(170)  (U)  Other FISA records responsive to plaintiff's request, if they exist, implicate classified intelligence activities and methods, and acknowledging the existence or non-existence of any such records reasonably can be expected to cause damage to national security. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method, and information generated by it, is

---

[32] (U) The FBI's Glomar response based on Exemptions (b)(1) and (b)(3) is limited to the existence or non-existence of any other FISA-authorized surveillance records that would be responsive to plaintiff's request.

SECRET//NOFORN

needed by United States Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the use or non-use of the activity or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, method, and source are to be preserved.

(171)   (U)  Intelligence activities and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness.  Intelligence activities and methods are valuable only so long as they remain unknown and unsuspected.  Once an intelligence activity or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(172)   (U)  The U.S. Government must do more than prevent explicit references to an intelligence activity or method; it must also prevent indirect references to them.  One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information.  We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts.  Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(173)   (U)  Here, acknowledging the existence or non-existence of responsive FISA records on targets other than Carter Page would confirm whether or not the FBI has relied on a particular intelligence activity or method targeted at particular individuals or organizations

SECRET//NOFORN

SECRET//NOFORN

during a particular period of time. The FBI has not confirmed or denied the existence of FISA records within the scope of plaintiff's request other than as to Carter Page. Confirming or denying whether any or not other responsive records exist would reveal otherwise non-public information regarding the nature of the FBI's intelligence interests, priorities, activities, and methods—information that is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.

(174)   (U) The FBI also cannot confirm or deny the existence or non-existence of records responsive to Items 3-5 of plaintiff's request as to the FISA-authorized surveillance of Page without risking harm to the national security. These three items of plaintiff's request seek records that, if they exist, would confirm that the FBI conducted particular types of FISA-authorized electronic surveillance targeted at Carter Page during a particular period of time. For example, in order to substantively respond to plaintiff's Item 3 and Item 5 requests, the FBI would have to confirm or deny that it intercepted Page's oral communications; to substantively respond to Item 4, the FBI would have to confirm or deny that it intercepted Page's e-mail/electronic communications. Publicly confirming or denying these details would reveal to hostile actors what intelligence information the FBI likely does or does not know. For example, if the FBI confirmed that it intercepted oral but not electronic communications of Page during a particular period (*i.e.*, October 2016 – when FISA surveillance was first authorized – to November 8, 2016 – the cut-off date of plaintiff's request), hostile actors would be able to pinpoint the intelligence information likely known or unknown to the FBI. Additionally, confirming or denying whether FISA records responsive to Items 3-5 exist would tend to reveal the effectiveness of this intelligence method. That is, if the FBI confirmed or denied that such information exists from a very narrow period of time, it would reveal how successful the method

SECRET//NOFORN

SECRET//NOFORN

is and how quickly the FBI can or cannot obtain intelligence information through the particular method. Such information is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.

(175)  (U) Accordingly, to confirm or deny that the FBI possesses or does not possess other FISA records responsive to plaintiff's request could risk compromising intelligence activities or methods, and thus would pose at least a serious risk to the national security.[33]

(U) *Foreign Relations and Foreign Activities of the United States*

(176)  (U) The FBI also cannot confirm or deny the existence or non-existence of FISA-authorized surveillance against targets other than Page without risking harm to the national security under 13526, § 1.4(d). Plaintiff's request, to the extent that it seeks information about FISA-authorized surveillance on other targets, necessarily implicates U.S. foreign relations and foreign activities in relation to foreign governments or government officials/employees.

(177)  (U) FISA prescribes procedures for the collection of "foreign intelligence information" of "foreign powers" and "agents of foreign powers." Thus, on its face, a request for information about FISA materials implicates foreign relations and foreign activities because those are at the heart of the FBI's use of FISA as an intelligence and investigative tool.

(178)  (U) The FBI's confirmation or denial of the existence of responsive records about other FISA targets could reasonably be expected to cause damage to the national security interests of the United States by negatively impacting U.S. foreign relations with these and other countries. Given the sensitivity of the United States' present and future relationships with foreign countries and the importance of such relationships to our national security, requests like

---

[33] (U) FISC orders, applications, and minimization procedures are classified, at a minimum, at the SECRET level.

SECRET//NOFORN

plaintiff's—which, directly or indirectly, call for records that would relate to sensitive and appropriately classified details of the United States' relationship with foreign government(s)—reflect precisely the situation in which the FBI finds it necessary to assert a partial Glomar response to plaintiff's request.

(179)  (S//NF) ██████████████████████████

██████████████████████████████

██████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████

██████████████████████████

███████

SECRET//NOFORN

(180)  (U) Accordingly, confirming or denying the existence or non-existence of particular FISA records can reasonably be expected to cause serious damage to the national security by undermining our relationships with foreign partners.

### (U) FOIA EXEMPTION (b)(3) AS A BASIS FOR THE GLOMAR RESPONSE

(181)  (U) Exemption (b)(3) protects information that is specifically exempted from public disclosure by a statute that requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, establishes particular criteria for withholding, or refers to particular types of matters to be withheld.  5 U.S.C. § 552(b)(3)(A).  If the non-disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it must specifically cite this paragraph in order for Exemption (b)(3) to apply.  *Id.* at § 552(b)(3)(B).

(182)  (U) Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1 (i)(1) (the "National Security Act"), provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure."  Accordingly, the National Security Act constitutes a federal statute which "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" under 5 U.S.C. § 552(b)(3).  Under the direction of the DNI, other components within the U.S. Government are authorized to protect intelligence sources and methods from unauthorized disclosure.

(183)  (U) As previously described in relation to the Exemption (b)(1) Glomar explanation, acknowledging the existence or non-existence of (a) records about FISA targets other than Carter Page or (b) records about the FISA-authorized surveillance of Page falling within Items 3-5 of plaintiff's request would tend to reveal classified information about

SECRET//NOFORN

SECRET//NOFORN

intelligence methods[34] that risks compromising the national security interests of the United

States. Accordingly, the National Security Act, in conjunction with Exemption (b)(3), provides

an additional and independent basis for the FBI's partial Glomar response to plaintiff's request.

(U) **FOIA EXEMPTIONS (b)(7)(A) AND (b)(7)(E) AS BASES FOR THE GLOMAR RESPONSE**

(184)  (U) As discussed above, before an agency can invoke any of the harms

enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue

were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must

demonstrate that the records at issue are related to the enforcement of federal laws and that the

enforcement activity is within the law enforcement duty of that agency.

(185)  (U) The only circumstance under which the FBI can request a FISA order is

when the FBI is conducting an authorized, predicated national security investigation within the

scope of its law enforcement and foreign intelligence responsibilities.  Similarly, the FBI's use of

electronic surveillance under legal authorities other than the FISA requires an authorized,

predicated investigation within the scope of its law enforcement responsibilities.  Accordingly,

records of surveillance authorized under the FISA or other legal authority – when they exist – are

records compiled for law enforcement purposes.

(U) *Exemption (b)(7)(A)*

(186)  (U) FOIA Exemption 7(A) protects "records or information compiled for law

enforcement purposes [when disclosure] could reasonably be expected to interfere with

enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

---

[34] (U) An intelligence method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization determined to be of national security interest; any procedure (human or non-human) or intelligence source, used to obtain information concerning the individual or organization; and foreign liaison relationships.

SECRET//NOFORN

SECRET//NOFORN

(187)  (U)  In addition to satisfying Exemption (b)(7)'s threshold, an agency must establish that (a) there is a pending or prospective law enforcement proceeding and (b) disclosure of responsive records could reasonably be expected to adversely affect it.

(188)  (U)  As previously noted, in July 2016, the FBI opened an investigation of Russian election interference.  On May 17, 2017, the Acting Attorney General appointed Robert S. Mueller, III as Special Counsel to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including Russian election interference. DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017).  That investigation is on-going.  To the extent that plaintiff is seeking records related to that investigation, the requirement of a pending enforcement proceeding in Exemption (b)(7)(A) is satisfied.  To the extent that plaintiff's request implicates some other investigation, responsive records – if they exist – would likely also be related to a pending investigation given the facts, circumstances, and timing of this request.

(189)  (U)  The final element – interference with that investigation – is readily established.  Confirming or denying the existence or non-existence of records about other FISA targets or about electronic surveillance conducted under other authorities would reveal non-public information about the focus, scope, and conduct of the pending Russian election interference investigation.  Specifically, it would reveal whether or not specific investigative techniques have been used; when and to what extent they were used, if they were; their relative value or benefit if they were used; and the targets they were used against, if any.  Additionally, confirming or denying the existence or non-existence of records about the Page FISA

SECRET//NOFORN

SECRET//NOFORN

surveillance responsive to Items 3-5 of plaintiff's request would reveal the relative value or benefit of that surveillance. Prematurely disclosing non-public information about the Russian election interference investigation could give subjects, witnesses, and others the information necessary to: take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats.

(190) (U) And if some investigation other than the Russian election interference investigation exists, the FBI would similarly be unable to confirm or deny the existence or non-existence of any records responsive to plaintiff's request without causing the same harms to such an investigation.

(191) (U) Accordingly, confirming or denying the existence or non-existence of responsive records, beyond those acknowledged and processed here, could reasonably be expected to adversely affect a pending investigation. Therefore, the FBI's partial Glomar response is justified under Exemption (b)(7)(A) as well.

## (U) *Exemption (b)(7)(E)*

(192) (U) Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552 (b)(7)(E). This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details

SECRET//NOFORN

SECRET//NOFORN

about the use of well-known techniques and procedures.

(193)  (U)  How the FBI applies its investigative resources (or not) against a particular allegation, report of criminal activity, or perceived threat is itself a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E).

(194)  (U)  As previously demonstrated, acknowledging or denying the existence or non-existence of the law enforcement records that plaintiff seeks, beyond the records acknowledged and processed in this case, would be tantamount to confirming or denying whether or not the FBI is employing specific investigative techniques authorized under the FISA or other legal authorities against specific targets as part of the pending Russian election interference investigation or other investigations, if they exist.  Even in acknowledged investigations, the FBI does not routinely disclose whether or not it has employed particular investigative techniques against particular targets and during very specific periods of time.  Such an acknowledgment would reveal when and under what circumstances the FBI relies upon particular techniques in an investigation.  Confirming whether or not FBI has responsive records would provide pieces of information that adversaries could use to ascertain at what point, and against whom we might use particular techniques.  Armed with this information, adversaries could glean significant insight into the activities likely to attract – or not attract – the FBI's law enforcement attention.  These individuals would then be able alter their behavior to avoid attention by law enforcement, making it more difficult for the FBI to be proactive in assessing threats and investigating crimes.

(195)  (U)  Moreover, as to Items 3-5 of plaintiff's request about the Page FISA-authorized surveillance, confirming or denying the existence or non-existence of such records would reveal the particular types of FISA-authorized electronic surveillance the FBI conducted on Carter Page during a particular period of time and would tend to reflect the relative success of

SECRET//NOFORN

SECRET//NOFORN

the use of particular techniques, including how quickly or not the FBI can gather information using such techniques. Such information is highly desired by hostile actors who seek to thwart the FBI's law enforcement and intelligence-gathering missions.

(196)    Therefore, the FBI can neither confirm nor deny the existence of any responsive records, beyond those acknowledged and processed here, without causing harms protected against by FOIA Exemption (b)(7)(E).

(U) **PART IV:**
**OLC PARTIAL GLOMAR RESPONSE**

(197)    (U)  I have reviewed the FOIA request directed to the DOJ Office of Legal Counsel (OLC), as well as the Declaration of Paul Colborn, which OLC submitted in support of the Defendants' original motion for summary judgment in this case, *see* ECF No. 31, Motion for Summary Judgment, and ECF No. 31-4, Declaration of Paul Colburn, and the declaration OLC is submitting in support of the Defendants' renewed motion for summary judgment. As noted above, DOJ has previously confirmed that it has no responsive records specifically related to the President's March 4, 2017 tweets. And DOJ has now confirmed FISA-authorized surveillance of Carter Page based on the four publicly acknowledged FISA packages discussed herein. In consultation, the FBI and OLC have concluded that the existence or non-existence of other responsive records in the possession of OLC would indicate whether or not legal advice was sought about proposed surveillance of the type that the FBI cannot confirm or deny without revealing classified and/or exempt information. As OLC generally only provides legal advice in response to concrete requests, any positive or negative response by OLC, beyond that already provided, risks revealing the very information that the FBI has protected through its Glomar response. Accordingly, the existence or nonexistence of responsive documents in the possession

SECRET//NOFORN

SECRET//NOFORN

of OLC would reveal the same information and FBI equities protected by FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E) for the same reasons given above.

(U) **PART V:  CONCLUSION**

(198)  (U)  For the reasons described above, the FBI's partial Glomar response to plaintiff's request is proper; the FBI's search for records responsive to the portion of plaintiff's request for which the Glomar response has been pierced was reasonably calculated to, and in fact did, locate the responsive records; the FBI properly protected information in the initial Page FISA package pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), and (b)(7)(A) and (C)-(E); the FBI properly withheld other records responsive to Items 1, 2, and 6 of plaintiff's request pursuant to Exemption (b)(7)(A); and the FBI reasonably segregated and released non-exempt information on the pages released in part and properly concluded that it could not do so on the pages withheld in full.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A and B attached hereto are true and correct copies.

Executed this 9th day of November 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

SECRET//NOFORN

IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

KEVIN POULSEN,

      Plaintiff,

          v.

U.S. DEPARTMENT OF DEFENSE et al.,

      Defendants.

Civil Action No.:   17-cv-3531

# EXHIBIT A



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

July 20, 2018

MR. KEVIN POULSEN
POST OFFICE BOX 31902
SAN FRANCISCO, CA 94131

Civil Litigation No.: 17-cv-03531
Subject: U.S, Alleged Electronic Surveillance of
Donald J. Trump
(2016 Election Campaign)

Dear Mr. Poulsen:

The enclosed documents were reviewed under the Freedom of Information Act (FOIA), Title 5, United States Code, Section 552.   As a result of President Trump's declassification of the House Permanent Select Committee (HPSCI) Majority Staff's January 18, 2018 memorandum entitled "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation," which revealed DOJ and the FBI had sought and obtained authority under the Foreign Intelligence Surveillance Act (FISA) to conduct surveillance of Carter Page, and the subsequent release of the HPSCI Minority's January 29, 2018, memorandum entitled "Correcting the Record – The Russia Investigation," which provided additional information about the Page FISAs, the government was required to review these records for potential release of segregable information in response to FOIA requests for these materials.

Below you will find check boxes under the appropriate statute headings which indicate the types of exemptions asserted to protect information which is exempt from disclosure.   The appropriate exemptions are noted on the enclosed pages next to redacted information.   The checked exemption boxes used to withhold information are further explained in the enclosed Explanation of Exemptions.

|  **Section 552** |  |  **Section 552a** |
| --- | --- | --- |
| ☑ (b)(1) | ☑ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| <u>50 USC Section 3024(i)(1)</u> | ☑ (b)(7)(D) | ☐ (k)(2) |
| | ☑ (b)(7)(E) | ☐ (k)(3) |
| | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) | | ☐ (k)(7) |

589 pages were reviewed and 412 pages are being released.

Below you will also find additional informational paragraphs about your request.   Where applicable, check boxes are used to provide you with more information about the processing of your request.   Please read each item carefully.

☐   Documents were located which originated with, or contained information concerning, another Government Agency [OGA].

☐   This information has been referred to the OGA for review and direct response to you.

☐   We are consulting with another agency.   The FBI will correspond with you regarding this information when the consultation is completed.

☐

In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) and Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA).   See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Enclosed for your information is a copy of the Explanation of Exemptions.

Although your request is in litigation, we are required by 5 USC § 552 (a)(6)(A) to provide you the following information concerning your right to appeal.   You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIA online portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

☐   The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation.   Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s).   Our experience has shown such additional references, if identified to the same subject of the main investigative file, usually contain information similar to the information processed in the main file(s).   As such, we have given priority to processing only the main investigative file(s) given our significant backlog.   If you would like to receive any references to the subject(s) of your request, please submit a separate request for the reference material in writing.   The references will be reviewed at a later date, as time and resources permit.

☑   See additional information which follows.

Sincerely,

David M. Hardy
Section Chief
Record/Information
   Dissemination Section
Information Management Division

Enclosures

The enclosed documents represent a release of information responsive to your FOIA request.   The attached documents are Bates stamped 17-cv-597(FBI)-1-412.[1]   An additional 177 responsive pages were categorically withheld pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).

Please note this response also constitutes Department of Justice, National Security Division's final response to your FOIA request to their agency for this same material.

---

[1] 17-cv-597(FBI) was used as the Bates stamp prefix because the records responsive to your request were processed in response to the FOIA request at issue in *James Madison Project, et al. v. Department of Justice*, 17-cv-00597 (District of D.C.).

As previously described, the FBI has no records responsive to your request to the extent that the request seeks records related to the President's March 4, 2017 tweets.   Furthermore, beyond what is released herein, the FBI neither confirms nor denies the existence of additional records responsive to this request because merely acknowledging whether or not responsive records exist would itself cause harms protected against by FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).

This material is being provided to you at no charge.

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

KEVIN POULSEN,

        Plaintiff,

            v.

U.S. DEPARTMENT OF DEFENSE et al.,

        Defendants.

Civil Action No.:   17-cv-3531

# EXHIBIT B

## FOIA Exemption Code Index

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD | Dup | Dup of | WIF Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | X | X | X | X | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 2 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 3 | X | X | X | | | | | | X | X | | | | | | | | X | | | | | | | |
| 4 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | | |
| 5 | X | X | X | | | | | | X | X | | | | | | | | X | | | | | | | |
| 6 | X | X | X | | | | | | X | X | X | | | | | | | X | | | | | | | |
| 7 | X | X | X | | | | | | X | X | X | | | | | | | X | | | | | | | |
| 8 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 9 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 10 | | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 11 | X | X | X | | | | | | X | X | | | | | | | | X | | | | | | | |
| 12 | X | X | X | | X | | | | X | X | | | | | | | | X | | | | | | | |
| 13 | X | X | X | | X | | | | X | X | | | | X | | | | X | | | | | | | |
| 14 | X | X | X | | X | | | | X | X | | | | | | | | X | | | | | | | |
| 15 | X | X | X | | X | | | | X | X | X | X | X | | | | | X | | | | | | | |
| 16 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 17 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 18 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 19 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 20 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 21 | X | X | X | | | | | | X | X | | | | | | | | X | | | | | | | |
| 22 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 23 | X | X | X | | | | | | X | X | | | | | | | | X | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | X | | | | | | | | |
| 25 | | | X | | | | | | X | X | | | | | | | | X | | | | | | | |
| 26 | X | X | X | | | | | X | X | X | | | | | | | | X | | | | | | | |
| 27 | X | X | X | | | | | X | X | X | | | X | X | | | | X | | | | | | | |
| 28 | X | X | X | | | | | | X | X | | | | | | | | X | | | | | | | |
| 29 | X | X | X | | X | | | X | X | X | X | X | | X | | | | X | | | | | | | |
| 30 | X | X | X | | X | | | X | X | X | X | | | X | | | | X | | | | | | | |
| 31 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | | |
| 32 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 33 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | | |
| 34 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | | |
| 35 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 36 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 37 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 38 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 39 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 40 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 41 | X | X | X | | X | | | | X | X | X | | | X | X | | | X | | | | | | | |
| 42 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 43 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 44 | X | X | X | | | | | | X | X | | | | X | | | | X | | | | | | | |
| 45 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 46 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |
| 47 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | | |

1

| Bates | b1 | b3 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD | Dup | Dup of | WIF Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | |
| 49 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | |
| 50 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 51 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 52 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 53 | | | | | | | | | | | | | | | | | X | | | | | | | |
| 54 | X | X | X | X | | | | | | | | | | | | | | X | | | | | | |
| 55 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 56 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 57 | X | X | X | | | | | | X | X | | | | | | X | | X | | | | | | |
| 58 | X | X | X | | X | | | | X | X | | | | | | X | | X | | | | | | |
| 59 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | | | | |
| 60 | X | X | X | | | | | | X | X | X | | | | | | | X | | | | | | |
| 61 | X | X | X | | | | | | X | X | X | | | | | | | X | | | | | | |
| 62 | X | X | X | | | | | | X | X | X | | | | | | | X | | | | | | |
| 63 | X | X | X | | | | | | | | | | | | | | | X | | | | | | |
| 64 | X | X | X | | | | | | X | X | | | | X | | | | X | | | | | | |
| 65 | X | X | X | | | | | | X | | | | | | | | | X | | | | | | |
| 66 | | | X | | | X | | | | | | | | | | | | X | | | | | | |
| 67 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 68 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 69 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 70 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | |
| 71 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | | | | |
| 72 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 73 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 74 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 75 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 76 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 77 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 78 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 79 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 80 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 81 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 82 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | | | | |
| 83 | X | X | X | | | | | | | | | | | | | | | X | | | | | | |

Case 3:17-cv-03531-WHO   Document 66-1   Filed 11/09/18   Page 85 of 85

2