UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEVIN POULSEN,

Plaintiff,

v.

DEPARTMENT OF DEFENSE, et al.,

Defendants.

Case No. 17-cv-03531-WHO

**ORDER ON PENDING MOTIONS**

Re: Dkt. Nos. 48, 50, 66

Kevin Poulsen seeks documents regarding electronic surveillance of President Donald J. Trump or any of his advisors during the 2016 election campaign through the Freedom of Information Act (FOIA). Poulsen contends that the government has waived any the right to issue a *Glomar* response – refusing to confirm or deny the existence of responsive documents – because of a number of statements by members of the government regarding allegations of, and in one limited instance confirmation of, electronic surveillance conducted during that time.

After reviewing the government agencies' justifications for their continued assertion of *Glomar* in the publicly filed declarations from each agency and two classified submissions, I find that the government has demonstrated substantial grounds to maintain the *Glomar* responses to everything except the documents necessarily covered by the limited public acknowledgment of the electronic surveillance of Carter Page. Reviewing the justifications for redacting and withholding with respect to that limited set of acknowledged documents, the government has adequately justified its redactions and withholdings. Accordingly, ODNI and NSA's cross-motion for summary judgment is GRANTED, Poulsen's motion for summary judgment as to ODNI and NSA is DENIED, and the motion for summary judgment by NSD, OLC, and the FBI is GRANTED.

# BACKGROUND

## I.    FOIA REQUESTS AND INITIAL RESPONSES

On March 4, 2017, Poulsen submitted a series of similar FOIA requests to various agencies of the federal government ("Requests"), seeking release of records concerning the United States' electronic surveillance of President Donald J. Trump or any of his advisors during the 2016 election campaign. The Requests were submitted to the FOIA offices of: (i) the National Security Agency (NSA, a component of the Department of Defense); (ii) the Office of the Director of National Intelligence (ODNI); (iii) the Federal Bureau of Investigations (FBI, a component of the Department of Justice (DOJ)); (iv) Office of Legal Counsel (OLC, a component of the DOJ); and (v) the National Security Division (NSD, a component of the DOJ) (collectively "Agencies").

The Requests sought "records concerning the United States' alleged electronic surveillance of Donald J. Trump during the 2016 election campaign," and as background identified a series of comments President Trump made through the social media platform Twitter on March 4, 2017, discussing that purported electronic surveillance.  Although Poulsen used slightly different terms for some of the Agency Requests, he generally requested release of the following categories of records:

> 1.    Legal analyses, memorandum, court orders, meeting notes, calendar entries, presentation slides, petitions, applications, motions and appeal briefs held by FBI concerning, planning or seeking authorization for electronic surveillance, by a U.S. government agency or contractor, of the oral, electronic or digital communications of Donald J. Trump or any of his advisors between June 16, 2015 and November 8, 2016
>
> 2.    Reports, e-mail, affidavits and documents held by FBI concerning or derived from such surveillance or anticipated surveillance
>
> 3.    Recordings produced from such surveillance, including audio or video recordings and data files
>
> 4.    Metadata captured from such surveillance, including but not limited to email headers and timestamps
>
> 5.    Transcripts of such intercepted communications
>
> 6.    Entries pertaining to such surveillance found in FBI databases, including but not limited to the FBI's ELSUR Data Management

System and the FBI's Case Management System

Declaration of W. Gordon Kaupp, Ex. A (Dkt. No. 68-2, FBI), Ex. B. (Dkt. No. 68-3, NSD/OLC; *see also* Declaration of W. Gordon Kaupp Dec. (Dkt. No. 48-1), Ex. H (NSA), Ex. I (ODNI).[1]

In each of his Requests, Poulsen asked for expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(II) on the grounds of an "an urgency to inform the public concerning an actual or alleged Federal Government activity…made by a person primarily engaged in disseminating information." Compl. ¶ 19. Poulsen also sought fee waivers (for search, review, and copying) under 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 28 C.F.R. § 16.10(k)(1) on the grounds that he qualifies as a "representative of the news media" and because the records are not sought for commercial use. *Id.* ¶ 20.

## II.    AGENCY RESPONSES

The Agencies responded at different times with slightly different responses.

NSA Response

On March 24, 2017, the NSA invoked Exemption 1 under FOIA (protecting classified information) and issued a *Glomar* response, stating that it would neither confirm nor deny the existence of the records sought. The NSA also invoked Exemption 3 and claimed it was withholding information specifically protected from disclosure by statute citing 18 U.S.C. § 798; 50 U.S.C. § 3024; 50 U.S.C. §3605. The NSA admitted that it had not conducted any search and had not made a determination concerning Poulsen's request for fee waiver as a representative of the news media. That same day, Poulsen appealed the NSA's denial of the Request.

On April 25, 2017, the NSA denied Poulsen's appeal. *See* Declaration of David Sherman (Dkt. No. 31-8), at ECF pgs. 23-25, 29-30.

ODNI Response

On March 15, 2017, the ODNI granted Poulsen's request for a fee waiver and denied his request for expedited processing. On March 27, 2017, Poulsen appealed the ODNI's denial of

United States District Court
Northern District of California

---

[1] The different FOIA Requests sought generally the same type of documents (*e.g.*, documents regarding electronic surveillance) but were tailored to documents the responding agency might have. For example, in his request to the FBI, Poulsen sought entries in specific record management systems used by the FBI. FBI Request (Dkt. No. 68-2).

expedited processing and on April 13, 2017, the ODNI reversed its decision to deny expedited processing of the Request. However, as of June 19, 2017 – the date the Complaint was filed – the ODNI had not made any determination concerning the Request, processed the Request, or produced any records. *See* Declaration of Patricia Gaviria (Dkt. Nos. 31-6, 31-7), Ex. C. Eventually, ODNI provided a substantive response, invoking *Glomar* as well as Exemptions 1 and 3, consistent with NSA's response. Gaviria Decl., ¶ 16.

<u>FBI Response</u>

On April 4, 2017, the FBI issued a formal *Glomar* response, refusing to confirm or deny the existence of any responsive records. On April 28, 2017, the DOJ's Office of Information Privacy (OIP) affirmed the FBI's determination and invocation of *Glomar*. Declaration of David Hardy (Dkt. No. 31-1), ¶¶10, 12 & Exs. D, F.

<u>NSD Response</u>

On March 17, 2017, the NSD issued a formal *Glomar* response, refusing to confirm or deny the existence of any responsive records. The assertion of *Glomar* was affirmed by DOJ's OIP on August 2, 2017. Declaration of G. Weinsheimer (Dkt. Nos. 31-2, 31-3), Exs. B, D.

<u>OLC Response</u>

OLC had not made a formal determination by the time this case was filed. But issued its *Glomar* response on November 17, 2017. Declaration of Paul Colborn (Dkt. Nos. 31-4, 31-5), Ex. C.

## III.  FILING AND PROCEDURAL POSTURE OF THIS CASE

Poulsen, contending the Agencies' responses were either untimely or legally deficient, filed this suit on June 19, 2017. In November 2017, the government moved for summary judgment to confirm the adequacy of each Agency's response. Dkt. No. 31. In support of that motion, each of the Agencies either affirmed or stated in the first instance that they would rely on *Glomar* to refuse to confirm or deny the existence of responsive records.

However, due to subsequent disclosures by governmental individuals regarding part of the subject matter covered by Poulsen's Requests, the government moved to withdraw the motion for summary judgment so that each Agency could determine whether the disclosures "impacted" their

1   response and whether documents responsive to the request could be acknowledged or produced.

2   Dkt. No. 42.  Poulsen objected, but I granted the government's request due to concerns of

3   efficiency and orderly adjudication.  However, NSA and ODNI represented that their FOIA

4   responses were *not* impacted by the disclosures, and they intended to stick with their full *Glomar*

5   responses.  Therefore, I directed the parties to file cross-motions for summary judgment on the

6   FOIA responses by NSA and ODNI, while the other Agencies were given time to finish their

7   consideration of the impact of the public disclosures.  Dkt. No. 46.  The cross-motions with

8   respect to NSA and ODNI were filed and have been pending since September 5, 2018.

9        On November 11, 2018, the remaining agencies – NSD, OLC, and the FBI – filed their

10   motion for summary judgment.  Poulsen responded on December 7, 2018.  In that motion, the

11   government admits that there were two "public acknowledgements" relevant to Poulsen's FOIA

12   Requests.

13        The first acknowledgement was in the March 20, 2017 Congressional testimony of then-

14   FBI Director James B. Comey, where Comey confirmed that the FBI had (in July 2016) opened an

15   investigation of "the Russian government's efforts to interfere in the 2016 Presidential election[.]"

16   Third Declaration of David M. Hardy (3rd Hardy Decl., Dkt. No. 66-1) ¶ 12 & n.2.  As part of his

17   testimony, and the "public acknowledgment" that the FBI admits narrowly waived part of its

18   initial *Glomar* defense, Comey admitted that the FBI had no records of alleged wiretapping of

19   then-candidate Trump in Trump Tower by the Obama Administration prior to the 2016

20   presidential election (as referenced in President Trump's Twitter post on March 4, 2017).  *Id*. ¶ 8.

21        The second acknowledgement resulted from the President's declassification of a

22   memorandum prepared by staff of the House Permanent Select Committee on Intelligence

23   ("HPSCI," the "Nunes Memo") and the subsequent release of a different memorandum prepared

24   by certain HPSCI members (the "Schiff Memo").  In light of the declassification and release, the

25   government acknowledged the existence of Foreign Intelligence Surveillance Act ("FISA")

26   applications and orders to conduct surveillance of Carter Page.  3rd Hardy Decl. ¶¶ 17-23.

27        Because of those official acknowledgments, the DOJ does not maintain a *Glomar* response

28   for the existence of the Carter Page FISA applications or orders.  The FBI and NSD admit that

5

they maintain some records related to the acknowledged FISA applications and orders; OLC confirmed that it has located no records related to the acknowledged FISA applications and orders. 3rd Hardy Decl. ¶ 29; Declaration of Patrick N. Findlay (Dkt. No. 66-2) ¶ 20; Second Declaration of Paul P. Colborn (2nd Colborn Decl., Dkt. No. 66-3) ¶ 15.

As a result, the FBI and NSD processed the acknowledged documents under FOIA for a limited production to Poulsen and other FOIA requestors.[2] Because the DOJ interpreted Poulsen's FOIA Requests as covering *only* the initial Carter Page FISA application (dated October 2016), but not the three renewals, only documents related to that first application were processed for release to Poulsen (although the remainder of the documents/renewals were processed for production to other FOIA requestors). 3rd Hardy Decl. ¶ 26. With respect to the October 2016 application, the DOJ produced 83 pages and withheld in full 186 pages relevant to all four applications. *Id*. ¶¶ 27-28.[3] The information redacted and withheld in full has been withheld under Exemptions 1 (classified and exempt intelligence information); Exemption 3 (information revealing intelligence sources and methods protected by the National Security Act); Exemptions 7(A), 7(D), and 7(E) (protected law enforcement information), and Exemptions 6 and 7(C) (private information). 3rd Hardy Decl. ¶ 39.

As the information sought by Poulsen was broader than just the disclosed-FISA applications and orders, and Poulsen sought other information related to the Carter Page surveillance, the FBI and NSD withheld that additional information under Exemption 7(A). They assert a partial *Glomar* refusing to "confirm or deny the existence of specific subcategories" of the request as they "relate to Carter Page" because that would disclose the existence or nonexistence of specific types of surveillance results withheld under Exemptions 1, 3, 7(A) and 7(E). 3rd Hardy Decl. ¶¶ 160-163.

Finally, the FBI, NSD, and OLC assert *Glomar* in regards to confirming or denying the

_____

[2] The DOJ acknowledged that there was an initial FISA application (dated October 2016) and three renewal applications for surveillance of Carter Page. 3rd Hardy Decl. ¶ 24.

[3] Hardy declares that the Agencies cannot disclose how many of the 189 withheld in full pages are relevant to the initial application or the subsequent renewals for a classified reason. 3rd Hardy Decl. ¶ 28.

existence of non-Carter Page documents (for any other FISA applications, orders, or other electronic surveillance). They contend that confirmation or denial could cause harms protected by Exemption 1, Exemption 3, Exemptions 7(A) and 7(E), and for the OLC, Exemption 5. *Id.*; *see also* 2nd Colburn Decl., ¶¶ 16, 18, 20.

## IV.   PUBLIC DISCLOSURES

Poulsen claims that none of the Agencies can assert a *Glomar* response due to public disclosures related to the subject matter of his Requests. The "official acknowledgments" identified by Poulsen in his Complaint and in the briefs filed in this case extend beyond the two limited acknowledgments identified by the DOJ above. They include the following:

### A.   Tweets & Comments from the President

- A March 4, 2017, message sent or "tweeted" by President Donald J. Trump via the social media platform Twitter that: "Terrible! Just found out that Obama had my 'wires tapped' in Trump Tower just before the victory. Nothing found. This is McCarthyism!"

- A second tweet the same day from President Trump: "Is it legal for a sitting President to be 'wire tapping' [sic] a race for president prior to an election? Turned down by court earlier. A NEW LOW!"

- A third tweet the same day from President Trump that: "How low has President Obama gone to tapp [sic] my phones during the very sacred election process. [Sic] This is Nixon/Watergate. Bad (or sick) guy!"

- Comments made by President Trump in a November 2, 2017, radio interview:

  > Howie Carr: When are we gonna find out if the FBI used the dossier, ah, used the dossier to get those FISA warrants.

  > Trump: Well I think they did. I think they did, because when ah, when Comey came up to see me what he did is he showed me the dossier, that was what he was showing me. The thing he showed me was the dossier. So I think they did use it, and I think they shouldn't have been allowed to. From what I'm hearing and you know I'm not  . . . .

- President Trump's November 29, 2017 tweet, where he commented "The House of

Representatives seeks contempt citations(?) against the Justice Department and the FBI for withholding key documents and an FBI witness which could shed light on surveillance of associates of Donald Trump. Big stuff. Deep State. Give this information NOW!"

- President Trump's January 19, 2018 tweet: "Just signed 702 Bill to reauthorize foreign intelligence collection. This is NOT the same FISA law that was so wrongly abused during the election. I will always do the right thing for our country and put the safety of the American people first."

*See, e.g.*, Poulsen's Opposition to Motion for Summary Judgment (Dkt. No. 68), 2-5, 15, 22 & n4, n5.

In addition, Poulsen attaches significance to the White House's announcement on September 17, 2018, of the President's declassification of "all FBI reports of interviews prepared in connection with all Carter Page FISA applications," disclosing the existence of "interviews" used to obtain FISA authorization. *Id*. at 13.[4]

### B. Executive & Congressional Statements

Poulsen also relies on the following:

- On March 20, 2017, during a House Intelligence Committee public hearing that Poulsen alleged was held in part to investigate President Trump's claims about being wiretapped by President Obama, then-FBI Director James Comey testified and stated, "With respect to the president's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI."

- On March 22, 2017, House Intelligence Chair, Representative Devin Nunes stated: "I have seen intelligence reports that clearly show that the president-elect and his team were, I guess, at least monitored."

- The May 17, 2017 DOJ announcement of the appointment of Robert S. Mueller to serve as

---

[4] The Agencies point out, however, that in a September 21, 2018 tweet, the President clarified that he had not declassified anything and instead asked the Inspector General to review the documents on an expedited basis. Agencies' Reply at 8 n.4; *see also* Agencies' Mot. at 8 n.5.

Special Counsel to investigate: (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a).

- The February 2, 2018 letter by Counsel to the President Donald F. McGahn II to U.S. Representative Devin Nunes (McGahn Letter), explaining the President's decision to declassify a January 18, 2018 Memorandum issued by the House Permanent Select Committee on Intelligence (Nunes Memo). The letter explained that the President:

> has directed lawyers and national security staff to assess the declassification request, consistent with established standards governing the handling of classified information, including those under Section 3.1(d) of Executive Order 13526. Those standards permit declassification when the public interest in disclosure outweighs any need to protect the information. The White House review process also included input from the Office of the Director of National Intelligence and the Department of Justice. Consistent with this review and these standards, the President has determined that declassification of the Memorandum is appropriate.

- The Nunes Memo's disclosure of the following:

> On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order (not under Title VII) authorizing electronic surveillance on Carter Page from the FISC. Page is a U.S. citizen who served as a volunteer advisor to the Trump presidential campaign….

> The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA renewals from the FISC. As required by statute (50 U.S.C. § 1805(d)(1)), a FISA order on an American citizen must be renewed by the FISC every 90 days and each renewal requires a separate finding of probable cause.

Poulsen's Motion for Partial Summary Judgment (Dkt. No. 48) at 3-6.

## C.    Court Documents

Poulsen also relies on the following documents that have been filed in court in conjunction with the Special Counsel's prosecutions:

- The Statement of the Offense, *United States of America v. George Papadopoulos*, Case No. 1:17-cr-182-RDM ECF No. 19 (D.D.C. Oct. 5, 2017) (*USA v. Papadopoulos*) and Statement of the Offense, *Unites States of America. v. Michael Flynn*, Case No. 1:17-cr-232-RC, ECF No. 4 (D.D.C. Dec. 1, 2017) (*USA v. Flynn*).

Poulsen does not identify the significant facts disclosed in these two documents, but instead broadly asserts that the stipulated facts show establish the existence "of responsive records *vel non* – electronic surveillance (by collection of the content of emails and telephone calls) of Trump campaign advisors." Dkt. No. 68 at 15 (citing Dkt. Nos. 52-3 and 52-4); *see also* Dkt. No. 52 (Poulsen's Reply) at 8-9.[5]

- The Verified Applications to the Foreign Intelligence Surveillance Court and Primary Orders and Warrants concerning surveillance of Carter Page (Carter Page FISA materials).

Poulsen, again, does not identify any specific facts revealed in the released FISA materials that would constitute an additional or broader wavier by the government. Poulsen's Reply at 8-9.

## V. AGENCY DECLARATIONS

Each Agency relies on declarations to support their assertion of *Glomar* and, with respect to the partial disclosures by the FBI and NSD, their withholding of information related to the processed Carter Page applications and orders. Two of the submissions, parts of the 3rd Hardy Declaration and another document submitted on February 14. 2019, were themselves classified and reviewed by me.

### A. ODNI

ODNI relies on the declaration of Patricia Gaviria, the Director of ODNI's Information Management Division (IMD), who manages and gives guidance on information management programs and practices across the Intelligent Community (IC). Dkt. No. 50-1, ¶¶ 1-2.[6] She

---

[5] In his briefing, the most specific Poulsen gets in identifying significant "facts" disclosed in the Papadopoulos and Flynn court filings – are that "additional targets or sources in the Flynn and Papadopoulos Statements of the Offense" included "the Professor," "Putin's niece," and "a senior official in the Trump Transition Team." Poulsen also identifies as significant "Flynn's Statement of the Offense details the contents of numerous telephone calls between Flynn and officials within the Presidential Transition Team and Russian operatives or agents, including the Russian Ambassador." Poulsen's Reply at 14-15; Kaupp Decl., Exs. D and E.

[6] According to Gaviria: "The IC is comprised of ODNI; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the Army, the Navy, the Air Force, the Marine Corps, the Coast Guard, the FBI, the Drug Enforcement Administration, and the Department of Energy; the Bureau of Intelligence and Research of the Department of State; the Office of Intelligence and Analysis of the Department of the Treasury; the Office of Intelligence and Analysis of the Department of

10

explains that ODNI's main role is managing and directing the tasking, collection, analysis, production and dissemination of national intelligence by elements of the IC.  *Id.* ¶ 7.  DNI also coordinates "relations between elements of the IC and the intelligence or security services of foreign governments or international organizations on intelligence matters."  *Id.*  Under FISA, DNI has the responsibility "in connection with other IC elements' acquisition of foreign intelligence information concerning non-United States persons located outside the United States" to prepare certifications identifying categories of foreign intelligence that may be collected.  *Id.* ¶ 8.  But DNI is not involved in the "'traditional' FISA application process" seeking judicial authorization for collection of data on specific targets.  *Id.*  DNI does not, itself, conduct surveillance operations.  *Id.*  DNI is required by the National Security Act and Executive Order 12333 to protect intelligence sources and methods from unauthorized disclosure.  *Id.* ¶ 9.

ODNI did not issue a formal response to Poulsen's FOIA Request before this case was filed.  In her declaration, Gaviria explains that ODNI determined that it can neither confirm nor deny the existence of the records sought in the Request because that would "reveal a classified fact and intelligence sources or methods-namely, whether the IC has an intelligence interest in a particular individual, whether the IC is conducting particular intelligence activities, whether the IC utilizes particular intelligence sources or methods, and whether foreign intelligence information was in fact obtained through electronic surveillance efforts."  *Id.* ¶ 16.  Providing a substantive response would cause harm that FOIA exemptions (b)(1) (protecting classified information) and (b)(3) (protecting intelligence sources and methods under the National Security Act) protect against.  *Id.* ¶ 17.

Gaviria declares also that the statements relied on by Poulsen "do not constitute official acknowledgments of ODNI-held records" and therefore "do not effect a waiver of ODNI's Glomar response."  *Id.* ¶ 18.  With respect to the Nunes Memo, Gaviria notes that while the President declassified the Nunes Memo, he did not "declassify all arguably related information.  As it relates

---

Homeland Security; and such other elements of any other department or agency as may be designated by the President, or jointly designated by the DNI and heads of the department or agency concerned, as an element of the IC.  *See* 50 U.S.C. § 3003(4)."  *Id.* ¶ 2, n.1.

to this case, the President did not declassify everything that may or may not exist regarding electronic surveillance that may or may not have occurred between June 16, 2015 and November 8, 2016 that may or may not have been directed by a U.S. government agency or contractor and that may or may not have acquired the oral, electronic, or digital communications of Donald J. Trump or any of his advisors, and records derived from such surveillance (as requested in Poulsen's FOIA Request). . . . Nor does the Nunes Memo indicate whether or not foreign intelligence was obtained from the electronic surveillance directed at Carter Page or whether any such information was shared with ODNI or the IC." *Id.* ¶ 21. Gaviria contends the public disclosure does "not match" the specific information sought by Poulsen's FOIA request. *Id.*

With respect to the tweets, Gaviria likewise characterizes them as "many steps removed" from the subject matter of the FOIA Requests as applied to ODNI records, and ODNI "determined that the cited tweets do not officially acknowledgement the existence of records held by ODNI that are responsive to Poulsen's Request. Nor do the tweets specify which agencies may have conducted 'wiretapping' directed at the President or his then-advisors." *Id.* ¶¶ 22-23.

Addressing Exemption 1, Gaviria declares that "acknowledging the existence or non-existence of records sought in the Request would require ODNI to reveal currently and properly classified facts." *Id.* ¶ 27. Specifically, "confirming the existence of any classified records on individuals or any associated intelligence activity would reveal the ODNI and the IC's interest in the particular individuals and could alert them that certain intelligence sources or methods are being employed by specific elements of the IC to collect information on them. Similarly, confirming the non-existence of classified records identifies an area in which ODNI and the IC have a lack of interest in the subjects or an inability to obtain information on the individuals or entities of interest and potentially confirms the success of any evasive techniques." *Id.* ¶ 28. Finally, revealing the existence or non-existence of such records "would reveal classified information about potential targets of interest who are not Donald J. Trump or his advisors, but rather persons who had electronic communications with those individuals between June 16, 2015 and November 8, 2016." *Id.* ¶ 29.

As to the disclosures, Gaviria asserts that despite declassification of the Nunes Memo, the

"harm to national security persists by confirming or denying that ODNI and the IC have an interest in foreign intelligence information derived from electronic surveillance directed at Carter Page within a certain period of time. This is because the DOJ's and FBl's investigative interest in Carter Page's electronic communications is different from the IC's interest in the foreign intelligence value of any such communications (if any). The fact of FBI electronic surveillance of Carter Page does not reveal the existence or non-existence of valuable foreign intelligence obtained as a result of such surveillance." *Id.* ¶ 31. ODNI, however, has publicly confirmed its interest in activities surrounding Russian interference with the 2016 U.S. election. *Id.* ¶ 33.

As to Exemption 3, Gaviria declares that Section 102A(i)(1) of the NSA protects disclosure of the sources and methods used by ODNI. She asserts that the other public disclosures relied on by Poulsen to show how ODNI operates and has operated in the past do not "match" the information disclosed in the sources relied on by Poulsen in this case. *Id.* ¶ 37. Finally, the harms to ODNI are the same ones discussed with respect to Exemption 1. *Id.* ¶ 38.

## B. NSA

NSA relies on the declaration of Steven E. Thompson, the Chief of Policy, Performance, and Exports, who is responsible for the oversight of NSA's FOIA/Privacy Act office.. Dkt. No. 50-3 ¶ 1. Thompson reiterates that the NSA cannot acknowledge the existence or nonexistence of the records sought by Poulsen because the existence or nonexistence of those records is a classified matter under Executive Order 13526 and exempt from disclosure under (b)(1) and (b)(3) (under the National Security Agency Act and Intelligence Reform and Prevention Act, as well as under 18 U.S.C. § 798). *Id.* ¶ 4.

NSA's foreign intelligence mission includes the responsibility to collect, process, analyze and disseminate signals intelligence (SIGINT) information for foreign intelligence and counterintelligence purposes. *Id.* ¶ 5. NSA "exploits" foreign signals to obtain intelligence through a worldwide collection network and that intelligence is used to counter threats but also to direct foreign policy. *Id.* ¶¶ 6-7. SIGINT information is distributed to a number of agencies and departments. *Id.* ¶ 7. Information obtained from intercepted foreign communications is called communications intelligence (COMINT). NSA's COMINT efforts are only part of the functions

and activities of NSA.  *Id.* ¶ 9.  Disclosure of the identity of targets whose specific communications have been intercepted are kept in "strictest secrecy" because of the fragility of NSA's ability to exploit foreign communications.  *Id.*  Disclosure of intercepted communications could reveal intelligence collection techniques and allow targets to adopt counter-measures.  *Id.*

In this case, NSA "interpreted" the FOIA request as seeking intelligence records on then-candidate Trump or his advisors during the specified time frame.  It asserted that acknowledgment of the existence or non-existence of responsive documents would indicate specific methods NSA uses to obtain foreign intelligence, identify specific intelligence targets NSA has under surveillance, and/or highlight topics of interest to NSA.  *Id.* ¶¶ 12, 19.

Thompson declares that the existence of non-existence of the records sought is protected, classified information exempt under Exemption 1, and that acknowledging the existence of non-existence of the information sought "would disclose information that is currently and properly classified TOP SECRET."  *Id.* ¶¶ 21-24.  Disclosure of that information could "reasonably be expected to harm national security because it would reveal NSA capabilities, activities, and intelligence priorities, which in turn could inhibit SIGINT collection and affect NSA's ability to counter threats to the national security of the United States."  *Id.* ¶ 24.  Disclosure of whether the NSA has records regarding the specific targets for the specific timeframe would disclose capabilities or gaps in capabilities as well as the agency's scope of interest or disinterest in specific targets.  If these sorts of acknowledgments were cumulative, adversaries would examine them together to piece together even more information about NSA's interests, targets, methods, and capabilities. *Id.* ¶¶ 25-26.  Therefore, NSA must use the *Glomar* defense consistently in all cases.  *Id.* ¶ 27.

As to the public statements by Nunes and President Trump, Thompson declares that those statements did not name the NSA as having been involved in the collection of surveillance.  *Id.* ¶¶ 28-29.  Nor did the Nunes Memo and the Democrats' response (Schiff Memo) mention the NSA or its activities.  *Id.* ¶ 30.  The general statements regarding NSA's powers and authority, as explained in a Joint Statement for the Record (submitted by ODNI, NSA, DOJ, and the FBI to the Senate Subcommittee in Intelligence in June 2017 to support the reauthorization of FISA

14

1    Amendments) also did not disclose the existence or non-existence of NSA information related to

2    the surveillance of then-candidate Trump or his campaign advisors.  *Id*. ¶ 32.

3         Finally, Thompson declares that Exemptions 3 applies because the existence or non-

4    existence of the records at issue reflect intelligence information that is protected from disclosure

5    under Section 6 of the National Security Act (50 U.S.C. § 3605), 18 U.S.C. § 798, and the 2004

6    Intelligence Reform and Terrorism Prevention Act amendments to the National Security Act (50

7    U.S.C. § 3024).  *Id*. ¶¶ 38-40.

8         **C.    FBI**

9         The FBI relies on three declarations submitted by David M. Hardy.  With respect to the

10   FBI's search, Hardy declares that because the official acknowledgment was limited (to the Carter

11   Page FISA applications and orders) and the Agency maintained its *Glomar* response as to the

12   other documents, only a limited search was required for the responsive FISA materials.  As such,

13   the FBI consulted with personnel familiar with the Russia investigation to locate the responsive

14   and acknowledged FISA materials, but the FBI did not search in its databases or other potential

15   sources of responsive records because those other records would be covered by the *Glomar*

16   response.  3rd Hardy Decl. ¶ 30.  The FBI did undertake an additional search of its Central Records

17   Systems (CRS) for documents responsive to categories 1, 2 and 6 of the FBI Request (seeking

18   legal analyses and petitions, reports/emails/affidavits, and entries in the FBI's database/record

19   keeping systems) for the period between June 16, 2015 to November 8, 2016, using the terms

20   "surveillance" and "FISA."  *Id*. ¶¶ 31, 36.  Additional searches of electronic records were

21   performed by other custodians, again attempting to locate other Page-FISA related documents.  *Id*.

22   ¶ 36.  Responsive records were located as a result of those searches, but those have been withheld

23   as "related-to" documents.  *Id*. ¶ 37.

24        With respect to the acknowledged Carter Page FISA applications and orders, the FBI

25   located and processed 598 pages from the four applications and orders (the October 2016 original

26   application and the three renewals).  The FBI released 5 pages in full, 407 in part, and withheld

27   186 in full.  3rd Hardy Decl. ¶ 25.  With respect to Poulsen's request, which the FBI considered

28   covered only the original application package, the FBI produced 2 pages in full and 81 pages

partially redacted.  *Id.* ¶ 27.

The FBI justified the redactions under Exemptions (b)(1), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  *Id.*  Hardy explains that because the President's declassification of the Nunes Memo declassified only a limited amount of information about the Carter Page surveillance, the unproduced information remains classified and can be withheld under Exemption 1.  Moreover, because the information sought pertains to an ongoing investigation, nondisclosure of the withheld information ("none of which exactly matches that disclosed in the Nunes, Schiff, or Grassley/Graham memos") is appropriate under Exemption 7(A).  3rd Hardy Decl. ¶ 38.  In addition, the withheld material also discloses information about intelligence gathering and sources protected under Exemptions 3, 7(D), and 7(E), and would disclose private information of individuals protected under Exemptions 6 and 7(C).  *Id.*

With respect to the "other" documents "related to" Carter Page surveillance (*e.g.*, documents concerning or planning the FISA authorization, reports or emails concerning or derived from the surveillance, FBI database entries corresponding to items 1, 2, and 6 in the FBI Request), Hardy asserts that the partial *Glomar* is justified because the FBI cannot acknowledge or deny the existence of those records without causing harms FOIA protects against.  *Id.* ¶ 29(A).  And with respect to all other documents conceivably covered by the FBI Request (items 3-5, seeking recordings produced from the investigation, metadata captured by the investigation, and transcripts of intercepted communications), Hardy justifies the partial *Glomar* because there has been no official public disclosure of the types of surveillance authorized by the FISC and even if there was disclosure about the types, there has been no official public disclosure about whether particular techniques were successful.  *Id.* ¶ 29(B).

### D.    NSD

NSD relies on the declaration of Patrick N. Findlay (Dkt. No. 66-2).[7]  In his initial declaration, Findlay explained that the only exception to NSD's initial *Glomar* response was that it, like the FBI, did not have any responsive records insofar as Poulsen's request to NSD sought

---

[7] In support of the withdrawn, initial motion for summary judgment, NSD also relied on the declaration of G. Bradley Weinsheimer, Dkt. No. 31-2.

16

records of alleged wiretapping by the Obama administration of then-candidate Trump in Trump Tower prior to the election. Weinsheimer Decl. ¶ 8. Otherwise, NSD issued a blanket *Glomar* response. It attests that "in general," NSD does not maintain records of wiretaps for the time period at issue other than for FISA-related materials and explains "that the fact that a FISA application was submitted or used in a particular case is classified national security information, as is the identification of specific individuals or organizations who are subjects of a national security investigation making use of a FISA warrant." Weinsheimer Decl. ¶ 11; Findlay Decl. ¶ 13.

Following the disclosures in the declassified Nunes Memo and the information in the Schiff Memo revealing the existence of the surveillance of Carter Page, NSD provided the Page FISA applications and orders to the FBI for processing under FOIA. Findlay Decl. ¶ 9. Because of the disclosures, NSD no longer asserts a *Glomar* response concerning the fact that Carter Page was the subject of FISA applications and orders. *Id*.

NSD does continue to assert a *Glomar* response to the existence or non-existence of records other than those relevant to the DOJ's 2017 acknowledgment that it has no records responsive to Poulsen's request for records of alleged wiretapping of then-candidate Trump in Trump Tower by the Obama Administration and the public acknowledgments and FOIA releases concerning the Carter Page FISA materials. *Id*. ¶ 12. Findlay justifies the *Glomar* response under Exemption 1 and Executive Order 13526 because the existence of FISA applications or the use of FISA applications, as well as the identity any specific individuals or organizations who are subjects of national security investigations are all classified information. *Id*. ¶ 13.

As to NSD's search for acknowledged records, Findlay declares that NSD's Office of Intelligence (OI) attorneys who were familiar with the Carter Page applications and orders were asked to identify and segregate all responsive documents, including emails, and subject matter experts in OI were asked to confirm the scope of the search and the application of exemptions to the responsive documents. *Id*. ¶ 21. The responsive FISA application materials were reviewed and processed by the FBI. *Id*. ¶ 22.

For responsive but withheld records, described by category, Findlay declares that they are exempt under 7(A) because they related to the ongoing Russian Election Interference

17

Investigation. *Id.* ¶ 23.[8]

### E. OLC

OLC relies on the declaration of Paul P. Colborn. 2nd Colborn Decl., Dkt. No. 66-3.[9] OLC has responded that it has no records responsive to the alleged wiretapping of then-candidate Trump in Trump Tower by President Obama prior to the election. 2nd Colborn Decl. ¶ 14. As to the second disclosure, OLC FOIA staff consulted with subject matter experts within OLC, including two long-serving career attorneys whose responsibilities cover matters involving surveillance and national security, and searched its database of unclassified legal advice for records relating to the Carter Page FISA materials; no responsive documents were located. *Id.* ¶ 15.

OLC maintains its *Glomar* response to the existence or non-existence of any records outside of the scope of those two limited disclosures. *Id.* ¶ 16. Colborn maintains that the *Glomar* response is appropriate because, otherwise, disclosure would indicate whether, when, and under what circumstances OLC provides legal advice in areas of national security and surveillance, revealing information exempt from disclosure under Exemptions 1, 3, and 7 as well as Exemption 5.

## LEGAL STANDARD

### I. *GLOMAR* AND WAIVER

The main issue in this case, as in *American Civil Liberties Union v. C.I.A.*, 710 F.3d 422 (D.C. Cir. 2013), concerns the intersection of two lines of FOIA cases. As explained by the court in *ACLU*:

---

[8] The general categories of these documents are records supporting the FISA application, draft applications and orders, attorney notes and other paper records, email communications, and other administrative documents. Findlay Decl. ¶ 28.

[9] The principal function of OLC is "to assist the Attorney General in his role as legal adviser to the President of the United States and to departments and to departments and agencies of the Executive Branch. OLC provides advice and prepares opinions addressing a wide range of legal questions" and that while OLC's legal advice may "inform the decisionmaking of executive branch officials on matters of policy . . . OLC's legal advice is not itself dispositive as to any policy adopted." 2nd Colborn Decl. ¶ 2. OLC's advice is generally kept confidential and is part of the larger deliberative process undertaken by the Executive. *Id.* ¶ 3.

The first is the *Glomar* line, which permits an agency to "refuse to confirm or deny the existence of records" in limited circumstances. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C.Cir.2007). "Because *Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information, they are permitted only when confirming or denying the existence of records would itself 'cause harm cognizable under an FOIA exception.'" *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (quoting *Wolf*, 473 F.3d at 374) (citation and internal quotation marks omitted); *see, e.g., Miller v. Casey*, 730 F.2d 773, 775–78 (D.C. Cir. 1984); *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). Accordingly, "[i]n determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374; *see, e.g., Gardels*, 689 F.2d at 1103–07.

The second line of cases is the "official acknowledgment" line, which provides that when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information. In other words, "'when information has been "officially acknowledged," its disclosure may be compelled even over an agency's otherwise valid exemption claim.'" *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). A plaintiff mounting an official acknowledgment argument "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id*. (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).

These two lines of cases converge when a plaintiff seeks to rebut a *Glomar* response by establishing official acknowledgment. In the *Glomar* context, the "specific information" at issue is not the contents of a particular record, but rather "the existence *vel non*" of any records responsive to the FOIA request. *Id*. at 379 (emphasis omitted); *see id. at* 380. Accordingly, the plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect. *See id*. at 379–80; *Marino v. DEA*, 685 F.3d 1076, 1081 (D.C. Cir. 2012). As we have explained, "in the context of a *Glomar* response, the public domain exception is triggered when 'the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request,' regardless whether the contents of the records have been disclosed." *Marino*, 685 F.3d at 1081 (quoting *Wolf*, 473 F.3d at 379).

"Under the FOIA, 'the burden is on the agency to sustain its action,' 5 U.S.C. § 552(a)(4)(B), and we review *de novo* the agency's use of a FOIA exemption to withhold documents." *Wolf*, 473 F.3d at 374. However, "in conducting *de novo* review in the context of national security concerns, courts 'must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Id*. (quoting *Miller*, 730 F.2d at 776) (internal quotation marks omitted). "Ultimately, an agency's justification for

> invoking a FOIA exemption," whether directly or in the form of a *Glomar* response, "is sufficient if it appears 'logical' or 'plausible.'" *Id.* at 374–75*; see Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C.Cir.2012); *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *see also* CIA Br. 19 (acknowledging that "[t]he same standard applies when the Government issues a *Glomar* response").

*ACLU*, 710 F.3d at 426–427. The two requirements to challenge a *Glomar* response, therefore, are to show that an "official acknowledgement" of the "specific information" covered by the FOIA request exists and to establish that the Agency has not adequately demonstrated the harm that might flow from an acknowledgement of whether documents do or do not exist. *See Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d, 326 (D.D.C. 2015).

The Agencies argue that the "logical and plausible" language in the *ACLU* opinion applies only to the *second* prong – the agency's assertion of harm – and cannot be used to determine waiver. *See James Madison Project v. Dept. of J.*, 302 F. Supp. 3d 12, 22 (D.D.C. 2018), *reconsideration denied in part*, 17-CV-00144 (APM), 2018 WL 3956426 (D.D.C. Aug. 16, 2018) ("The 'logical nor plausible' language of *ACLU*, by contrast, and which the court discusses further below, is used to evaluate an agency's justification for invoking a FOIA exemption to withhold records or issue a *Glomar* response."). The government argues that waiver under the first prong only exists upon a showing of "specificity" and "match," as explained by the D.C. Circuit in *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990):

> First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed .... Third, ... the information requested must already have been made public through an official and documented disclosure.

*Id.* at 765; *see James Madison Project*, 302 F. Supp. 3d at 20 (D.D.C. 2018) (applying *Fitzgibbon* factors in *Glomar* context).

Poulsen, on the other hand, contends that: (i) the "logical and plausible" test runs to both *Glomar* response prongs; (ii) many recent D.C. Circuit cases do not, themselves, strictly adhere to the *Fitzgibbon* factors and that test does not fully mesh with the *Glomar* context; (iii) D.C. Circuit cases addressing waiver in the *Glomar* context ask only whether the existence of the records requested has been publicly acknowledged, in that case there is a "match" between the disclosure

20

and the request and no further analysis of the *Fitzgibbon* factors is required. *See Smith v. CIA*, 246 F. Supp. 3d 28, 32 (D.D.C. 2017) ("*Fitzgibbon's* matching and specificity criteria, then, are not applicable in the *Glomar* context; in such cases, the court must analyze only whether the prior disclosure acknowledges the existence of the records sought."); *see also Am. Civ. Liberties Union v. Dept. of Def.*, 17 CIV. 3391 (PAE), 2018 WL 3146720, at *6 (S.D.N.Y. June 27, 2018) (rejecting government's argument that matching and specificity criteria – as adopted by the Second Circuit in *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) following *Fitzgibbon* – is required in *Glomar* waiver context).[10]

I agree with the government that the decision in *American Civil Liberties Union v. C.I.A.*, 710 F.3d 422 (D.C. Cir. 2013) did not fundamentally alter the test to determine whether an "official acknowledgment" precludes the assertion of a *Glomar* response or the application of the *Fitzgibbon* factors. Indeed, in cases following *ACLU*, the D.C. Circuit has continued to apply the *Fitzgibbon* factors in the *Glomar* context. *See Mobley v. C.I.A.*, 806 F.3d 568, 584 (D.C. Cir. 2015); *James Madison Project*, 302 F. Supp. 3d at 20. In addition, the most recent authority in the Ninth Circuit – considering when an "official acknowledgment" precluded the use of a *Glomar* response – applied the *Fitzgibbon* factors. *See Pickard v. Dept. of J.*, 653 F.3d 782, 786-87 (9th Cir. 2011) (adopting the *Fitzgibbon* standard for "official acknowledgment" in the *Glomar* context and requiring a showing that the "information requested must be as specific as the information previously released," that "the information requested must match the information previously disclosed," and that the "intentional, public disclosure [must be] made by or at the request of a government officer acting in an authorized capacity by the agency in control of the information at issue.").

## II.     JUSTIFICATIONS FOR WITHHOLDING

The FOIA calls for "broad disclosure of Government records." *CIA v. Sims*, 471 U.S. 159, 166 (1985). To ensure broad disclosure, the FOIA "gives individuals a judicially-enforceable

---

[10] The government argues that no reliance should be placed on the decision from the district court in *Smith v. CIA* because the court allowed the government to file a second motion for summary judgment – addressing in part the issue of waiver – and that motion has been under submission since late 2017. Reply (Dkt. No. 70) at 18 n.7.

right of access to government agency documents." *Lion Raisins v. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004) overruled on other grounds by *Animal Leg. Def. Fund v. U.S. Food & Drug Administration*, 836 F.3d 987 (9th Cir. 2016); *see also* 5 U.S.C. § 552. There is a strong presumption in favor of disclosure, *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and the "general philosophy of full agency disclosure [applies] unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989) (quotation marks and citation omitted). Therefore, FOIA's exemptions "must be narrowly construed." *Id*. at 154.

The government agency bears the burden to prove a particular document or redaction falls within one of the nine statutory exemptions from disclosure. *Ray*, 502 U.S. at 173; *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009). It may rely on affidavits to satisfy its burden of demonstrating that an exemption applies, but the affidavits must contain "reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption." *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (quoting *Lewis v. IRS*, 823 F.2d 375, 378 (9th Cir. 1987)); *see also Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012) ("To justify withholding, the government must provide tailored reasons in response to a FOIA request. It may not respond with boilerplate or conclusory statements."); *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1980) (noting that the government "may not rely on conclusory and generalized allegations of exemptions"). "[S]ummary judgment on the basis of such agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

Even if an exemption applies, an agency may only withhold the information to which the exemption applies. FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pacific

*Fisheries, Inc. v. U.S*., 539 F.3d 1143, 1148 (9th Cir. 2008). Nevertheless, the agency is also "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv*., 494 F.3d 1106, 1117 (D.C. Cir. 2007). Similarly, the court "may rely on an agency's declaration in making its segregability determination. Agency affidavits that are sufficiently detailed are presumed to be made in good faith and may be taken at face value." *Hamdan v. U.S. Dept. of Justice*, 797 F.3d 759, 779 (9th Cir. 2015). The court "need not conduct a page-by-page review of an agency's work." *Id*.

Finally, as particularly relevant to this case, "[w]here the government invokes FOIA exemptions in cases involving national security issues, [courts] are required to accord substantial weight to the agency's affidavits." *Hamdan*, 797 F.3d at 769. A court must be mindful of its "limited institutional expertise on intelligence matters, as compared with the executive branch." *Hamdan*, 797 F.3d at 770. However, the affidavits still "must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of agency bad faith." *Id*. at 769.

## DISCUSSION

### I.    *GLOMAR*

As noted above, NSA and ODNI rely on their full *Glomar* responses to refuse to confirm or deny the existence of the requested documents. The FBI, NSD, and OLC rely on *Glomar* to refuse to confirm or deny the existence of any responsive documents other than (1) the nonexistence of alleged wiretapping of then-candidate Donald J. Trump in Trump Tower by the Obama Administration prior to the 2016 presidential election and (2) the existence of documents related to the Carter Page FISA applications and orders.[11]

---

[11] In particular, the FBI asserts a partial *Glomar* as to documents responsive to categories from Poulsen's FOIA Requests seeking recordings from the surveillance, metadata captured from the surveillance, and transcripts of intercepted communications. FBI FOIA Request, Categories 3-5. NSD asserts a broader *Glomar*, refusing to acknowledge existence or non-existence of any documents other than those related to the FISA applications and orders. Finally, OLC asserts a partial *Glomar*, following its admission that it did not locate any documents responsive to the two disclosures.

Poulsen argues that there have been additional official statements acknowledging the existence of records covered by his FOIA Requests beyond those two. In addition, he contends that, considering the disclosed Carter Page FISA materials, the Agencies' interest in the surveillance of the Trump campaign as part of the investigation into Russian interference in the 2016 election has been disclosed and none of the Agencies may make a *Glomar* denial. In the alternative, Poulsen argues (on the initial round of motions) that ODNI and NSA have not adequately substantiated the harms under Exemptions 1 and 3 considering the disclosed information to justify their *Glomar* response. He seeks an order requiring the Agencies to conduct searches for responsive records, make segregability determinations, and produce a *Vaughn* index so that I may determine what records (if any) are non-exempt and must be turned over to him.

### A. Waiver/Official Acknowledgment

As discussed above, in order to find "official acknowledgment" precluding agency use of a *Glomar* response, Poulsen must show that the information requested by his FOIA Requests is "as specific as the information previously released," that the information requested matches the information previously disclosed," and that the "intentional, public disclosure [must be] made by or at the request of a government officer acting in an authorized capacity by the agency in control of the information at issue." *Pickard*, 653 F.3d at 786-87.

To start, I assume without deciding that tweets and apparently off-handed comments by the President (in other words comments not issued as intentional and express governmental disclosures) can be disclosures constituting "official acknowledgments" sufficient to waive a *Glomar* response under the third *Fitzgibbon*. However, other than for the Page FISA materials which have been acknowledged and processed for release under FOIA, none of the President's tweets or comments satisfy the specificity and matching criteria of *Fitzgibbon*.

ODNI and NSA argue that the President's comments do not "specify a government agency, nor do they mention any targets other than President Trump, the involvement of ODNI or NSA, or the use of any particular legal authority. Moreover, the statements are limited to a particular time, a particular target, and a particular place, in contrast to Poulsen's FOIA request. Thus, the statements do not match the information withheld by ODNI or NSA." NSA/ODNI

1    Oppo. (Dkt. No. 50) at 19.  None of the tweets relied on by Poulsen discuss "whether or not ODNI

2    or NSA would possess documents about such surveillance."  *Id*.  The FBI, NSD, and OLC point

3    out that the President's tweets and comments contain a "constellation of specific opinions and

4    allegations" regarding wiretapping, they do not mention targets by name (other than himself and

5    with respect to the Carter Page materials), do not mention any Agencies (except the FBI with

6    respect to a "dossier" used in connection with FISA applications), and the tweets appear to be

7    paraphrasing media reporting.  Agencies' Reply (Dkt. No. 70) at 20.[12]

8        I agree with the Agencies that the President's very general tweets and comments do not

9    disclose the existence of the specific documents sought in Poulsen's Requests.  There is no

10   disclosure establishing that any of the specific documents sought by Poulsen *exists*, much less a

11   match between the disclosures and the specific electronic surveillance information sought by

12   Poulsen.  The very specific information sought by Poulsen (records regarding electronic

13   surveillance conducted during a specific time and aimed at specific targets) does not match the

14   very general acknowledgments that there is an ongoing investigation into Russian interference in

15   the 2016 election, that the investigation has included some people associated with then-candidate

16   Trump's campaign, and that one such associate was the target of FISA applications and orders.

17   The only possibly acknowledged electronic surveillance, therefore, is of Page.  The confirmation

18   of the existence of any other type of surveillance or any other targets simply does not meet the

19   specificity or matching requirements of *Fitzgibbon*.

20       As to the Nunes Memo (and the responsive Schiff Memo) and the declassification by the

21   President of the Nunes Memo, the ODNI and NSA argue:

22           The declassification determination did not, explicitly or implicitly,

23

24   _____

     [12] As noted above, I assume without deciding that "tweets" and comments made during an
     interview could theoretically constitute "official acknowledgements" consistent with finding
25   waiver under FOIA.  However, I also note that the informal nature of comments made through
     tweets and in casual interviews might not constitute official acknowledgements where the
26   information disclosed appears to be based on media accounts and not on information supplied by
     Executive or Legislative sources.  *See, e.g., James Madison Project v. Dept. of Justice*, 330 F.
27   Supp. 3d 192, 215 (D.D.C. 2018) (where "President's tweets are premised on a news account
     quoting leaked, therefore unofficial, information, they do not amount to an official
28   acknowledgement of the existence of responsive records maintained by the DOJ and FBI.").

> declassify all arguably related classified information or other intelligence sources and methods. The President therefore declassified the existence of certain specific FBI FISA materials related to Carter Page; DOJ is currently processing those documents to determine whether DOJ will disclose additional information. But the existence or non-existence of surveillance materials related to Carter Page in the possession of ODNI or NSA is a distinct fact that has not been officially acknowledged, the disclosure of which could cause distinct harms. Gaviria Decl. ¶¶ 19-21; Thompson Decl. ¶¶ 30-31.

ODNI/NSA Oppo. (Dkt. No. 50) at 20. At most, Poulsen attempts to connect the fact that there was FISA-approved surveillance of Page with the fact that the investigation concerns foreign influence in the 2016 election to mean that – given the authority and roles of ODNI and NSA in coordinating or collecting foreign intelligence – there must be responsive records in those agencies' possession. But as those agencies point out, just because they have the authority to do something does not mean that they did. The Congressional testimony did not disclose anything ODNI and NSA did during the specific timeframe.

The FBI and NSD, because of the acknowledgments and processing of the Carter Page FISA materials, assert they have accounted for the scope of these Congressional disclosures. They argue, and I agree, that neither the contents of the declassified Nunes Memo nor the acknowledged existence of the national security investigation into Russian interference with the 2016 election creates any official acknowledgment or "inescapable inference" that there was electronic surveillance *beyond* the acknowledged Carter Page FISA materials.[13]

The Agencies' *Glomar* responses are not undermined by the Carter Page FISA disclosures. Simply because there was some very limited disclosure and acknowledgment of the use of electronic surveillance on one target – that was responsive to Poulsen's FOIA Requests – does not mean a *Glomar* response is unavailable to the agencies as to *other* undisclosed forms of electronic surveillance and undisclosed targets of electronic surveillance.

As to the DOJ's general acknowledgement of the investigation into links between Russia and the Trump campaign through Comey's testimony and the disclosure of the investigation being

---

[13] As noted, OLC disclosed that it had no documents related to the Carter Page FISA applications (and no documents related to the Comey's "no records" testimony on behalf of the FBI) and otherwise asserted a *Glomar* response.

1    handled by Special Counsel Mueller, those disclosures do not match the information sought

2    (records of electronic surveillance held by specific agencies, regarding specific targets, created

3    during a limited timeframe) and are not specific enough to cover Poulsen's FOIA Requests.

4         Finally, Poulsen's reliance on facts the government has alleged or admitted in court filings

5    in connection with the prosecutions of Flynn and Papadopoulos are no more helpful. Poulsen does

6    not identify the significance of specific facts disclosed in those filings other than supporting what

7    is otherwise known, that the Special Counsel has investigated members of the Trump campaign

8    for a link to or coordination with the Russian government. Those general disclosures in no way

9    match the specific information regarding electronic surveillance sought by Poulsen.

10        Viewed together, the statements and disclosures identified by Poulsen do not create an

11   official acknowledgment (other than for the acknowledged Carter Page FISA materials that have

12   been processed). This conclusion – and a strict adherence to the specificity and matching

13   requirements – is particularly important in this case because the disclosed investigation into

14   Russian interference with the 2016 election *is ongoing*. The best Poulsen can do is make

15   unsupported assertions that because electronic surveillance was approved for Page under FISA

16   there *must* be other targets. And because electronic surveillance of Page was approved there *must*

17   be recordings and metadata produced from that surveillance. Those assertions are based, at best,

18   on assumptions. A party's assumptions cannot be used to preclude a *Glomar* response.[14]

19        This conclusion would not change if I consider whether the disclosures identified by

20   Poulsen created an "inescapable inference" that documents other than the Page materials exist.

21   Poulsen's Oppo. at 12-13 (arguing inescapable inference as to responsive records to items 3-5 of

22   the FBI Request). Poulsen repeatedly relies on the *ACLU* case from the D.C. Circuit to argue that

23   there is an "inescapable inference" that some of these agencies must have some responsive records

24   given what has been disclosed generally (beyond the disclosed Carter Page FISA materials and

25   "related to" but withheld documents). Even if the question of "inescapable inference" is relevant

---

[14] Because Poulsen has not met the first two *Fitzgibbon* factors, as adopted in the Ninth Circuit by *Pickard*, I need not reach the third. However, as noted above, I have assumed that tweets and media comments by the President qualify as the source of official acknowledgments.

to the "official acknowledgment" prong of the *Glomar* challenge, the facts of the *ACLU* case show its application here does not change the outcome. In *ACLU*, the President and other members of the Executive disclosed the use of drones by the government generally, and the agency defendant (the CIA) itself repeatedly publicly disclosed its "interest" in using drones for intelligence purposes. Therefore, the agency could not stand on a *Glomar* response to protect disclosure of whether it had the already-acknowledged interest. *ACLU*, 710 F.3d at 430. In addition – also directly relevant to *Glomar* – the Agencies' own representatives' broad and repeated statements made "it neither 'logical' nor 'plausible' to maintain that the Agency does not have any documents relating to drones." *Id.* at 431.

Here, there are no statements – other than the limited one by Comey on behalf of the FBI which the FBI, NSD and OLC have responded to – by the Agencies *themselves* that touch upon the use of electronic surveillance by these Agencies in connection with the Special Counsel's investigation or otherwise into Russian interference with the 2016 election. The President's comments and Congressional disclosures, including the Presidential declassification of information in the Nunes Memo, have likewise been addressed and responded to by the Agencies. The very specific nature of Poulsen's FOIA Requests for electronic surveillance records for specific targets for specific dates, overlapping with an acknowledged and ongoing investigation by the intelligence community, distinguishes this case from *ACLU*.

The very general official acknowledgments regarding the ongoing investigation, the one specific acknowledgment of surveillance of Carter Page, and the Special Counsel's prosecutions do not preclude the Agencies from asserting *Glomar* to protect disclosure of whether and how they are each involved in that investigation, and whether their participation in that investigation has used specific types of surveillance and produced specific types of intelligence. Each Agency has explained the harm that would be caused by those disclosures – required if they could not assert a *Glomar* response – and those explanations (supplemented by the classified information I have reviewed) are sufficiently detailed, plausible, and evince no bad faith.[15]

---

[15] Poulsen's attempt to analogize his Requests and the disclosures at issue to the specificity and matching found by the Ninth Circuit in the *Pickard* case is unpersuasive. In *Pickard*, the request

In his cross-motion to ODNI and NSA's blanket assertion of *Glomar*, Poulsen argues that even if there has not been a waiver through official acknowledgment, his motion should nonetheless be granted because NSA and ODNI have not demonstrated that cognizable harm could result under Exemptions 1 or 3.  He asserts that President Trump has already declassified some of the information he requested and that the United States has already revealed the intelligence sources and methods (*i.e.*, electronic surveillance) as well as the targets (*i.e.*, candidate-Trump and his advisors).

Poulsen does not make this argument in his Opposition to the FBI, NSD, and OLC's motion for summary judgment.  Instead, he relies exclusively on the "official acknowledgment" prong and then – in response to the redactions and withholdings from the Carter Page FISA records processed by these agencies – contends that the Agency declarations are "so deficient" and vague that he cannot effectively contest their assertions of harm and the related justifications for the redactions and withholdings.  Poulsen's Oppo. (Dkt. No. 68) 17-21.

I will briefly address the arguments Poulsen raises as to ODNI and NSA and address the substantive responses by the other Agencies below.

### 1.     Exemption (b)(1)

FOIA Exemption 1 exempts from disclosure information that is "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy" and is "in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1).  The NSA invoked Executive Order (E.O.) 13,526, which permits an agency to withhold information that an official with original classification authority has determined to be classified because its "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security[.]" Classified National Security Information, Exec.

---

was not "broad" (it was for records regarding a specific confidential informant) and the disclosure was not "broad" (it was the disclosure at trial of the identity of that specific confidential informant). 653 F.3d at 784, 787 (finding an official disclosure precluding a *Glomar* response where "government, as part of its case-in-chief, intentionally elicited testimony from [the CI] and several DEA agents as to [the CI's] activities as a confidential informant in open court in the course of official and documented public proceedings.").

Order No. 13,526 § 1.4, 75 Fed. Reg. 707, 709 (Dec. 29, 2009).  The information must also

"pertain[] to" one of the categories of information specified in the Executive Order, including

"intelligence activities (including covert action), intelligence sources or methods," and "foreign

relations or foreign activities of the United States. . . ." Exec. Order 13,526 §§ 1.4(c), (d).  Under

E.O. 13526, the government has the burden of establishing that disclosure of the requested

information "could reasonably be expected to cause identifiable or describable damage to the

national security." 75 Fed. Reg. 707.

Here, with respect to ODNI and NSA, the Gaviria and Thompson declarations provide

sufficient detail regarding the withheld information to make the Exemption 1 assertions plausible.

*See Hamdan*, 797 F.3d at 770.  Gaviria states that providing any substantive response to Poulsen

would "reveal a classified fact and intelligence sources or methods – namely, whether IC has an

intelligence interest in a particular individual, whether the IC is conducting particular intelligence

activities, whether the IC utilizes particular intelligence sources or methods, and whether foreign

intelligence information was in fact obtained through electronic surveillance efforts."  Gaviria

Decl. ¶¶ 16, 27-33.  Thompson declares that giving a substantive response would "reveal the

existence or nonexistence of NSA reporting and/or intelligence on specific individuals, from

which one could determine whether or not NSA engaged in certain, or any, intelligence activities,

and/or did or did not target certain communications for collection."  Thompson Decl. ¶¶ 19,  24-

27.

Poulsen contends that the ODNI and NSA declarations are fatally deficient because they

do not address the Carter Page FISA declassifications and, therefore, do not address what harm

could flow from being forced to abandon their *Glomar* response.  However, the Agencies do

address the Page FISA material declassifications.  *See, e.g.*, Gaviria Decl. ¶ 21;  Thompson Decl.

¶¶ 28-30.  Poulsen does not identify why, in light of the very limited Carter Page disclosures, it is

illogical or implausible as a matter of law for ODNI and NSA to assert *Glomar*.  Poulsen also

complains that the ODNI and NSA declarations fail to explain how their admitted interest in

electronic surveillance or in targets including Trump's advisors in connection with the disclosed

investigation has not already been disclosed, in light of the public statements, particularly the

Flynn and Papadopoulos factual recitations in their plea agreements. But, as noted above, other than pointing generally to "facts" disclosed in the Flynn and Papadopoulos filings, Poulsen does not identify any specific facts that logically and plausibly show that ODNI or NSA *must* have documents responsive to Poulsen's very specific FOIA Requests to those agencies.

Recognizing the court's "limited institutional expertise on intelligence matters," I accord substantial weight to the Gaviria and Thompson declarations. I also note that both declarations are detailed and "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of agency bad faith." *Id.* at 769. My reliance on these detailed and plausible declarations is particularly appropriate here, where there is an acknowledge and ongoing investigation into actual or attempted foreign influence in a Presidential election. *See Hamdan*, 797 F.3d at 775 (recognizing that in the area of national security, "it is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency.").

### 2. Exemption (b)(3)

Exemption 3 exempts from disclosure records that are "specifically exempted from disclosure by [another] statute" if the relevant statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Fitzgibbon v. CIA*, 911 F.2d 755, 761-762 (D.C. Cir. 1990) (quotation omitted). The government may withhold more information under Exemption 3 than under Exemption 1, as it does not have to demonstrate that the disclosure will harm national security. *See Sims*, 471 U.S. at 167; *Gardels*, 689 F.2d at 1106–07. However, in the *Glomar* context, as opposed to the withholding/release context, the government must still demonstrate that disclosure of the existence

or non-existence of records would be "reasonably harmful to intelligence sources and methods." *Wolf v. CIA*, 473 F.3d at 377-78.

ODNI and NSA rely on three specific statutory provisions as a basis for the Exemption 3 withholdings. First, both agencies invoke Section 102A(i)(1) of the National Security Act of 1947, as amended (codified at 50 U.S.C. § 3024(i)(1)). That provision requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." It is well-established that Section 102A qualifies as a withholding statute for the purposes of FOIA Exemption 3. *See, e.g.*, *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007); *Freedom of the Press Found. v. DOJ*, 241 F. Supp. 3d 986, 998 (N.D. Cal. 2017).

Second, NSA also invokes the statutory privilege contained in Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605. Section 6 provides that "[n]othing in this chapter or any other law… shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof…". 50 U.S.C. § 3605(a). Through this language, Congress expressed its conclusion "that disclosure of NSA activities is potentially harmful." *Linder v. Natl. Sec. Agency*, 94 F.3d 693, 696 (D.C. Cir. 1996) (internal quotation omitted). Therefore, the courts have held that the protection provided by this statute is, by its very terms, absolute." *Id.* at 698.

NSA also invokes Section 798 of Title 18, which prohibits the unauthorized disclosure of classified information (i) concerning the communications intelligence activities of the United States or (ii) obtained by the process of communications intelligence derived from the communications of any foreign government. The term "communications intelligence," as defined by Section 798(b), means the "procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients." *See Larson v. Dep't of State*, 565 F.3d 857, 868 (D.C. Cir. 2009).

Despite the existence of these statutes, Poulsen argues that in the *Glomar* waiver context, NSA and ODNI have to show that specific harm would flow from disclosure of the existence or non-existence of the records, which he contends they have not done. He is correct that they must show harm in the *Glomar* context from disclosure of the existence of non-existence of records, but

United States District Court
Northern District of California

I find that they have shown that harm. The harms, plausible and detailed by the Gaviria and Thompson declarations, would be the same as those identified with respect to Exemption 1 above.

In sum, with respect to all of the Agencies, Poulsen has not met the test for an official acknowledgment sufficient to waive ODNI and NSA's ability to assert a full *Glomar* response and the FBI, NSD, and OLC's ability to assert partial *Glomar* responses to his Requests. The Agencies have shown – particularly in respect to the acknowledged existence of an ongoing investigation – that harms that would result from requiring them to provide any substantive response and that those harms are protected against by both Exemptions 1 and 3. Poulsen's Motion for Partial Summary Judgment against ODNI and NSA (Dkt. No.48) is DENIED and ODNI and NSA's Cross-Motion is GRANTED. Dkt. No. 50.

## II.  ADEQUACY OF SUBSTANTIVE RESPONSES FROM FBI, NSD, AND OLC

Poulsen argues that that little or no deference should be given to the declarations in support of the substantive responses of the FBI, NSD, and OLC (the "DOJ Agencies") because they are not sufficiently detailed to justify the scope of their searches or their redactions and withholdings based on asserted harms, and that there is evidence of bad faith on the part of the government. I disagree.

### A.  Carter Page FISA Application Materials

#### 1.  Search

As noted, the FBI, NSD and OLC searches were functionally limited to the two disclosed topics.[16] Poulsen contends that the searches, primarily by the FBI but also NSD, were deficient. First, Poulsen attacks the DOJ Agencies' decisions to limit their searches to records created before November 8, 2016. November 8, 2016 was used by Poulsen as the cutoff date for "recordings and metadata" in his Request, but he contends that his Request also covers legal analyses and other documents that had no similar limiting date and logically would have been created after that time

---

[16] In general, an agency defending a FOIA suit must demonstrate that it has conducted an "adequate" "search reasonably calculated to uncover all relevant documents." *Zemansky v. U.S. E.P.A.*, 767 F.2d 569, 571 (9th Cir. 1985). The adequacy of the search is judged "by a standard of reasonableness" and to satisfy its burden, the agency may rely upon "reasonably detailed, nonconclusory affidavits submitted in good faith." *Id.*

but regarding the same period of surveillance.  However, as the government points out, the request sought records *related* to surveillance *during* the campaign; only documents created during the campaign are responsive and the government's use of a November 8, 2016 cutoff was reasonable.

Second, Poulsen argues that the search was inadequate because it did not include a search for the names of Trump's campaign advisors and, in addition, the FBI should have searched under the names Flynn and Papadopoulos based on the disclosures made in the court filings by the Special Counsel.  Any such documents – if they existed – would fall outside the limited *Glomar* waiver.  There is no duty on an agency to "search" for records about which it properly asserts a *Glomar* response.  For the same reasons, Poulsen's third challenge to the DOJ Agencies' search – that they impermissibly failed to search for documents responsive to Categories 3-5 of his Requests – fails because the Agencies' assertion of *Glomar* to those categories is, as noted above, proper.

Poulsen's arguments concerning the adequacy of the searches by the responding Agencies fail.

### 2.     Redactions and Full Withholdings

As to the processed and withheld or redacted documents, Poulsen concedes that various categories of information were appropriately withheld.  Poulsen's Oppo. at 2 n.1 (listing uncontested categories of withheld information).  Poulsen also does not mention or otherwise challenge the Agencies' withholding of information under Exemptions 3, 6, or 7(C).

Instead, as to the categories of withheld information Poulsen continues to seek, he argues that the declarations from the FBI, NSD, and OLC are "deficient" and evidence bad faith, precluding my reliance on them.  Poulsen's specific arguments are: the declarations from the three responding Agencies are conclusory and should therefore be rejected outright; because many portions of the 3rd Hardy Declaration (where he justifies both the withholdings and the partial *Glomar* response) are classified, Poulsen is unable to adequately challenge Hardy's assertions including the assertions under Exemption 7(E) (which allows for disclosure of "known" investigatory techniques), Poulsen's Oppo. at 18; there is ample evidence of bad faith by the declarants, given that because the President characterized the DOJ's redactions to the released

Carter Page materials as "ridiculous" and overbroad and that any damage to Russian relations has already been done and cannot be further damaged by more specific disclosures. Therefore, he argues that there is both a genuine dispute of material fact as to the necessity of the DOJ Agencies' redactions and withholdings and sufficient evidence of bad faith that I cannot give credence and weight to the declarants' statements of harms. *Id.* at 19- 20.

As to the specificity of the declarations, I have reviewed each one. Each is adequately detailed and as specific as possible, given the national security and law enforcement operations.[17]

As to the classified materials, I realize that Poulsen has not seen them. I have. Hardy's classified explanations and the second classified submission provide specific, plausible, and significant reasons supporting the declarants' assertions that harms that would flow if the withheld materials were disclosed and the DOJ Agencies' partial *Glomar* responses not allowed.

As to bad faith, Poulsen contends there is ample evidence of "bad faith" obviating any deference to the declarants. He points to six facts. First, and primarily, he highlights the President's characterization of the redactions to the released Carter Page materials as "ridiculously heavily redacted." Poulsen's Oppo. at 17 n. 8. Second, in September 2018 the President directed ODNI and DOJ to declassify additional pages of the June 2017 FISA application and FBI reports of interviews prepared in connection with all of the Page FISA applications, yet the FBI never addresses why this information will be declassified yet still withheld from the FOIA response. Third, the declarants do not explain why the Carter Page FISA materials could be declassified and still the FBI can assert that total secrecy must cover all other materials. Fourth, Christopher Steele

---

[17] In particular, Poulsen contends that the DOJ Agencies have not shown the required "rational nexus" between enforcement of a federal law and the redacted/withheld information required under 7(A) because the Agencies don't identify any particular federal law they are enforcing. Poulsen's Oppo. at 20. However, that admitted national security investigation that is ongoing meets the 7(A) standard. *See, e.g., Ctr. for Nat. Sec. Stud. v. U.S. Dept. of Justice.*, 331 F.3d 918, 926 (D.C. Cir. 2003) (recognizing that the FBI's terrorism investigation that likely would lead to formal enforcement proceedings was sufficient under 7(A)). Poulsen also contends that Hardy has failed to show his personal knowledge that the FBI made express or implied assurances of confidentiality, which is required to withhold information regarding confidential sources under 7(D). *Id.* Poulsen's Oppo. at 20-21. To the contrary, Hardy's declaration provides sufficient detail that confidential sources were given those assurances to satisfy 7(D). 3rd Hardy Decl. ¶¶ 115 – 118.

1  was disclosed as a confidential source but the government provides no explanation of why it now

2  cannot disclose additional CIs.  Fifth, there can be no assertion of 7(E) in *Glomar* context because

3  the question is not whether something is "well-known" but whether it is known at all and the law

4  enforcement techniques used in these sorts of investigations are known.  Sixth, the disclosures as

5  well as the information disclosed in the court filings (as a result of the Special Counsel's

6  investigation) have already "clearly sent the message" to Trump campaign advisors that they are

7  being investigated.  Because the targets know this, Hardy's assertion that further disclosure could

8  "tip off" other targets or suspects is made in bad faith.

9         None of these arguments demonstrate bad faith or otherwise undermine the assertions of

10  harm proffered by the declarants.  After a close review of the Hardy Declarations, nothing in the

11  President's unexplained comment about the redactions from the Carter Page materials undermines

12  my conclusions.[18]  The President's September 2018 "declassification" directive was not an "order"

13  from the President covering this material, just a statement from the White House asking the

14  executive agencies to undertake a review and further justify the redactions.  Agencies' Reply (Dkt.

15  No. 70) at 6-8.  Finally, that the President declassified some very limited information and that

16  some investigative techniques are known to the public does not mean the FBI or other Agencies

17  cannot withhold other information that is classified, information about other confidential sources,

18  or information indicating whether particular techniques (while known) may have been employed.

19  There is simply no persuasive weight to the argument that because X was released without

20  apparent (or known) incident, Y should be released.

21         Poulsen's final complaints – that Hardy's assertions of harm from disclosure to the

22  ongoing investigation and foreign relations are in bad faith because the present investigation into

23  allegations of foreign interference in a Presidential election is an "extraordinarily unique" set of

24  circumstances and any harm to U.S./Russian relations has already been caused by the prior

25  disclosures of the contours of the investigation – are wholly unpersuasive.  Poulsen's speculation

26  does not undermine the detailed and specific justifications provided by Hardy.

27

28  _____
[18] There is no indication by Poulsen that the President, at the time of making his comments about the redactions, had access to the detailed justifications I have reviewed from Hardy.

The detailed and plausible DOJ Agency justifications are not undermined by bad faith.  In this context of an ongoing national security investigation, they adequately support the FBI's redactions and withholdings from the Carter Page materials.

### 3.    In Camera Review

Poulsen also requests that I conduct an *in camera* review of the 412 pages of redacted Page FISA materials, of the 186 pages of Page materials withheld in full, and of the additional "related to" the Page materials located by the FBI and NSD (of unspecified number).  I will not do so.

*In camera* review is used exceedingly sparingly, and even more rarely used where the withheld materials implicate national security.  *Lion Raisins Inc. v. USDA*, 354 F.3d 1072, 1079 (9th Cir. 2004) (explaining that *in camera* review is disfavored where "the government sustains its burden of proof by way of its testimony or affidavits"), *overruled on other grounds by Animal Legal Def. Fund*, 836 F.3d 987 (9th Cir. 2016); *see also Freedom of the Press Found. v. U.S. Dept. of J.*, 241 F. Supp. 3d 986, 1004 (N.D. Cal. 2017) (recognizing that *in camera* inspection is "'particularly a last resort in national security situations like this case—a court should not resort to it routinely on the theory that it can't hurt.'"  (quoting *ACLU v. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011)).  Where, as here, the Agency declarations are sufficiently detailed and persuasive and there is no evidence of bad faith, and in light of the national security context and the ongoing investigation, *in camera* review is not justified.  Having thoroughly reviewed the publicly filed declarations as well as the classified materials, Poulsen's policy arguments and speculation in an attempt to support a bad faith argument are unfounded.

### B.    Other Responsive Documents "Related" to Carter Page

As noted, the FBI and NSD have also withheld in full documents "related to" the Carter Page materials that were responsive to items 1, 2, and 6 of the FBI Request including: FD-1057 Electronic Communications (FBI internal communications), emails, spreadsheets, memoranda/reports. 3rd Hardy Decl. ¶ 149.  According to Hardy, those documents fell into the following functional categories for the FBI: investigative information (methods and procedures); substantive information (substance of surveillance); and administrative information (tasks and activities of personnel).  *Id*. ¶ 150.  These documents were withheld under 7(A), although Hardy

asserts that they are subject to withholding under exemptions (b)(1), (b)(3), (b)(5) (b)(6), (b)(7)(C), and (b)(7)(E) as well. 3rd Hardy Decl., ¶ 143. They fall within 7(A), according to Hardy, because the records were compiled for law enforcement purposes and they relate to the Russian election interference investigation, which is still pending. *Id*. ¶ 145. Hardy lists in detail, with much of the information classified, why disclosure of these documents created a reasonable expectation of harm. *Id*. ¶¶ 153-157. Similarly, the categories withheld in full by NSD under 7(A) include the following: records supporting FISC applications, draft applications and orders, attorney notes and paper records, email communications, and, other administrative documents (regarding processing, approval and submission of FISC applications). Findlay Decl. ¶¶ 26-31. Findlay's assertions of harm from disclosure, as Hardy's, are similarly supported.

Poulsen's attempt to challenge these withholdings mirror his challenges to the application of Exemptions, 1, 3, and 7 to the information redacted or otherwise from the Page FISA materials. These "related to" documents are protected from disclosure for the same reasons as those addressed above. Poulsen's speculation about what specific documents exist, the content of those documents, and the lack of harm from their disclosure are unpersuasive. The FBI and NSD have provided ample and specific reasons in their publicly filed declarations (supplemented by the classified information) to justify withholding of these "related to" documents in full.

## CONCLUSION

For the foregoing reasons, NSA and ODNI's motion for summary judgment is GRANTED (Dkt. No. 50), Poulsen's motion for partial summary judgment (Dkt. No. 48) is DENIED, and NSD, OLC and the FBI's motion for summary judgment (Dkt. No. 66) is GRANTED.

**IT IS SO ORDERED.**

Dated: March 22, 2019

William H. Orrick
United States District Judge